UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| INTREPID DIRECTIONAL DRILLING SPECIALISTS, LTD. PLAINTIFF, | § § § § | |
| VS. | § § | CA NO: 7:19-CV-101 |
| CIMAREX ENERGY CO. DEFENDANT. | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Intrepid Directional Drilling Specialists, Ltd. ("Intrepid"), Plaintiff, in the above-entitled and numbered cause, and files this its complaint against Defendant, Cimarex Energy Co. ("Cimarex"), and for cause of action would respectfully show the following:

### I.
### Parties

1. Plaintiff Intrepid Directional Drilling Specialists, Ltd. is a limited partnership organized under the laws of the State of Texas with its principal place of business in Midland County, Texas. Plaintiff is a resident of Midland County, Texas.

2. Defendant Cimarex Energy Co. is a foreign limited liability company organized under the laws of the State of Delaware. Cimarex's corporate headquarters are located in Denver, Colorado. Cimarex's principal place of business is located in Denver, may be served with process through its registered agent, at the following address: Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

## II.
## Jurisdiction & Venue

3. Paragraphs 1 through 2 of this Complaint are incorporated as though fully set forth herein.

4. This Court has jurisdiction over this action under 28 U.S.C. §1332 in that the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and there is complete diversity of citizenship.

5. Venue is proper in this district and division pursuant to 28 U.S.C. §1391 because this is the district and division where a substantial part of the events giving rise to this claim occurred.

## III.
## Factual Background

6. Paragraph 1 through 5 are incorporated as though fully set forth herein.

7. Intrepid is an oil and gas drilling company specializing in directional drilling necessary for horizontal wells.

8. In 2018, Intrepid entered into a Master Service Agreement with Cimarex (the "MSA") whereby Intrepid would drill a well as per Cimarex's specifications and thereafter invoice Cimarex for the services rendered. A copy of the MSA is attached hereto as Exhibit A.

9. The MSA was negotiated in Midland County, Texas.

10. The MSA was signed by Intrepid in Midland County, Texas.

11. The MSA states that it shall be governed and interpreted by the laws of the State of Texas.

12. Under the terms of the MSA, Intrepid was required to issue invoices for work performed and then Cimarex would pay the invoice within sixty (60) days of receipt of such invoice.

13. Under the MSA, if Cimarex intends to dispute an invoice it must notify Intrepid and specify the reasons for the dispute. Cimarex may withhold payment of the disputed item until settlement of the dispute, but payment shall be made of any undisputed portion.

14. Cimarex has previously forwarded any such notices to Intrepid's office in Midland County, Texas.

15. The MSA also provides that any prevailing party in any litigation relating to the MSA shall be entitled to recover its reasonable and necessary attorneys' fees and costs of litigation from the other Party.

16. The relationship between Cimarex and Intrepid is further governed by the Horizontal Drilling Services Quotation ("Quote") between Cimarex and Intrepid which lays out the specific costs for the tasks to be provided. The Quote was incorporated into the MSA. A copy of the Horizontal Drilling Services Quotation is attached hereto as Exhibit B.

17. The Quote was prepared by Intrepid in its Midland County, Texas office.

18. The Quote provides, in part, that abnormal wear and tear or damages resulting from drilling operations shall be charged as incurred at the actual cost plus ten percent.

19. The Quote was agreed to by all parties.

20. From November 2018 through March 2019, Intrepid provided goods and services to Cimarex for various drilling projects on wells located in Eddy County, New Mexico and Lea County, New Mexico.

21. Intrepid has provided valuable services at the request of Cimarex and with the understanding that such services would be compensated.

22. Intrepid relied on Cimarex's contractual reassurances in the MSA that it would pay the invoices presented to it unless they were disputed.

23. Cimarex knew that Intrepid expected to be paid for the work it performed under the MSA.

24. Cimarex has issued payments under the MSA and Quote to Intrepid in Midland County, Texas.

25. This includes, but is not limited to operations on the Vaca Draw #20-17 Fed #4H.

26. Intrepid successfully drilled the vertical portion of the Vaca Draw #20-17 Fed #4H but encountered difficulties while building the curve through no fault of Intrepid.

27. Cimarex ultimately released Intrepid from the Vaca Draw #20-17 Fed #4H.

28. Intrepid believes that subsequent contractors have encountered similar issues.

29. During this time Intrepid was providing work on a number of other projects for Cimarex.

30. Multiple invoices have been presented to Cimarex pursuant to the terms of the MSA.

31. In an effort to continue their working relationship, Intrepid ultimately offered Cimarex a concession on the Vaca Draw #20-17 Fed #4H as a result of the issues encountered, without admitting fault, because Intrepid was not at fault.

32. Cimarex has made a number of demands in response to this offer and has indicated that no outstanding Intrepid invoices would be paid until a resolution was reached on this issues.

33. At this time, there are past due and owing invoices in the amount of $677,874.95. These invoices were presented to Cimarex over sixty days ago.[1]  Copies of the invoices in question are attached hereto as Exhibit C.

34. Cimarex has not disputed any sum in the invoices attached hereto as Exhibit C.

35. Additionally, invoices in the amount of $166,386.59 were sent to Cimarex on March 4, 2019.[2]  Copies of the March 4, 2019 invoices are attached hereto as Exhibit D.

---

[1] This includes invoice numbers 12271805, 12281802, 12311823, 1131902 and 1211902 and Credit Memos 12311823, 12271805C, 1211902C.

36. Sixty days have not elapsed from the date that these invoices were presented to Cimarex but Intrepid believes that Cimarex has no intention of paying these invoices.

37. Cimarex has not disputed any of the invoices attached hereto as Exhibit D.

38. The total amounts due and payable to Intrepid from Cimarex at this time is $677,874.95.

39. An additional $166,386.59 will become due and owing after the required 60 days elapses.

40. Cimarex has failed to pay the reasonable value for the services provided by Intrepid, despite its contractual obligations.

### IV.
### Count 1: Suit on Sworn Account

41. Each and every allegation contained in the foregoing paragraphs 1-40, inclusive, is re-alleged as if fully rewritten herein.

42. Intrepid has attached the referenced invoices which remain outstanding, in whole or in part, for goods and services provided to Cimarex, and the required verification, all of which are incorporated as if fully set forth herein. *See* Exhibits C, D.

43. The invoices accurately reflect the goods and services Intrepid provided to Cimarex, the dates of performance, and the outstanding balances. *See* Exhibit C and D; *See e.g.,* Affidavit of Clint Leazer, a copy of which is attached hereto as Exhibit E.

44. All necessary credits and offsets have been applied.

45. The prices for these goods and services were just and true because the prices were agreed upon and/or reasonable and customary for such services in the industry. *See* Exhibit A and B.

46. The exhibits are verified and systematic records of the account representing a liquid money demand. These goods and services were provided to Cimarex at the request of Cimarex.

---

[2] This includes invoice Numbers 03041905, 03041906, 03041907, 03041908, 03041909, 030419010, 03041911, and 03041912.

47. After allowing all just and lawful payments, offsets, and credits to which Cimarex is entitled, there currently remains due and owing by Cimarex the total amount of SIX HUNDRED SEVENTY SEVEN THOUSAND EIGHT HUNDRED SEVENTY-FOUR DOLLARS AND 95/100 ($677,874.95).

48. After allowing all just and lawful payments, offsets, and credits to which Cimarex is entitled, an additional ONE HUNDRED SIXTY-SIX THOUSAND THREE HUNDRED EIGHTY-SIX DOLLARS AND 59/100 ($166,386.59) will become due and owing after sixty days elapses from the tender of the invoices on March 4, 2019.

49. Despite repeated requests for payment, Cimarex has refused and failed to pay amounts outstanding.

## V.
## Count 2: Breach of Contract

50. Each and every allegation contained in the foregoing paragraphs 1-40, inclusive, is re-alleged as if fully rewritten herein.

51. The parties have a valid, enforceable contract.

52. Under the terms of the MSA and the Quote, Intrepid agreed to provide goods and services to Cimarex and Cimarex agreed to provide payment to Intrepid.

53. Intrepid performed its obligations under the contract by providing goods and services to Cimarex.

54. Cimarex was obligated to issue payment within sixty (60) days of receipt of the invoices under the terms of the MSA and Quote.

55. Cimarex has currently failed to pay $677,874.95 in invoices that were issued at least 60 days ago. *See* Exhibit C.

56. Cimarex has indicated that it would not pay any outstanding invoice, including those already issued but not yet due and owing.  *See* Exhibit D.

57. Intrepid believes that Cimarex does not intend to pay the $166,386.59 in invoices issued on March 4, 2019. *Id.*

58. Cimarex is in breach of the invoices, the MSA, and Quote by failing to make payment to Intrepid under the terms of the invoices, the MSA, and Quote.

59. As a direct result of Cimarex's breach of contract, Intrepid has been and will be damaged in the amount of $844,261.54, plus interest, costs of Court, and attorneys' fees.

## VI.
## Count 4: Quantum Meruit

60. Each and every allegation contained in the foregoing paragraphs 1-40, inclusive, is re-alleged as if fully rewritten herein.

61. In the alternative, Intrepid seeks recovery in *quantum meruit* of the reasonable value of its goods and services provided to Cimarex.

62. Intrepid rendered valuable goods and services to Cimarex and during the course of performance of the services, some of Intrepid's equipment sustained abnormal wear and tear.

63. Cimarex has been notified of the rendering of such goods and services and has accepted the goods and services as well as the benefits thereof.

64. Such goods and services were accepted under circumstances so as to reasonably notify Cimarex that Intrepid, in providing the goods and services requested, expected to be paid by Cimarex.

65. Cimarex has been unjustly enriched by the acceptance of Intrepid's goods and services without full payment to Intrepid.

66. Intrepid therefore seeks recovery of damages equal to the reasonable value of all goods and services, provided to Cimarex and accepted by Cimarex without payment to Intrepid.

## VII.
### Count 5: Promissory Estoppel

67. Each and every allegation contained in the foregoing paragraphs 1-40, inclusive, is re-alleged as if fully rewritten herein.

68. Pleading further and in the alternative, if such be necessary, Intrepid seeks recovery under promissory estoppel.

69. Cimarex made a promise to Intrepid that Intrepid would receive payment for all services provided by Intrepid to Cimarex.

70. Intrepid reasonably and substantially relied upon the promise, to its detriment, in providing services for which Cimarex has failed to pay.

71. Intrepid's reliance was foreseeable by Cimarex.

72. Injustice can be avoided by enforcing Cimarex's promise to pay for services rendered by Intrepid.

## VIII.
### Attorney's Fees

73. Intrepid would show that it was necessary to retain the services of Cotton, Bledsoe, Tighe, & Dawson, P.C., to protect its interests and assert its claims against Cimarex under the MSA.

74. Pursuant to Texas law, the terms of the MSA, and the terms of the Quote Intrepid is entitled to recover from Cimarex its reasonable attorneys' fees.

## IX.
## Prejudgment Interest

75. Intrepid further shows that under Texas Finance Code §302.002, interest on open accounts accrues at the rate of six percent (6%) per annum, commencing on the 30th day after the day on which the sum is due and payable.

76. Intrepid is, therefore, entitled to prejudgment interest from the 30th day after each unpaid item of the account became due and payable.

## X.
## Conditions Precedent

77. Intrepid has performed all conditions precedent to recovery of the indebtedness, interest, and attorney's fees.

## XI.
## Jury Demand

78. Plaintiff demands a trial by jury herein.

## XII.
## Relief Sought

WHEREFORE, PREMISES CONSIDERED, Plaintiff Intrepid Directional Drilling Specialists, Ltd. prays that Defendant Cimarex Energy Co. be cited to appear and answer and that upon final hearing, Plaintiff, be awarded the following relief:

1) Judgment against Defendant for the amount of $844,261.54 currently due and owing or which will become due and owing during the pendency of this matter;

2) All reasonable collection costs, including reasonable attorney's fees;

3) Prejudgment interest at the highest rate allowable by law, commencing on the 30th day after the day on which the sum is due and payable;

4) Interest after judgment at the rate allowed by law until paid;

5) Costs of suit; and

6)      Such other and further relief to which Plaintiff may be justly entitled.

Respectfully submitted,

COTTON, BLEDSOE, TIGHE, & DAWSON, P.C.
500 West Illinois, Suite 300
Midland, Texas 79701
(432) 684-5782
(432) 682-3672 (Fax)

By: _____

**Melinda D. Hamm**
State Bar No. 24059924
mhamm@cbtd.com
**Matt Catalano**
State Bar No. 24003918
mcatalano@cbtd.com

**ATTORNEYS FOR PLAINTIFF,**
**INTREPID DIRECTIONAL DRILLING**
**SPECIALISTS, LTD.**

# EXHIBIT A



## MASTER SERVICE AGREEMENT

### *THIS AGREEMENT CONTAINS PROVISIONS RELATING TO INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK.*

**1.    PARTIES**

This Master Service Agreement ("Agreement") is entered into and effective the _____ day of _____, 20 ___ (the "Effective Date"), by and between _____ _____ ("Contractor") and **Cimarex Energy Co. ("Cimarex")**, on behalf of itself and its subsidiary, related, and affiliated entities, as and to the extent allowed in Section 3.b. Contractor and Cimarex may each be referred to individually as a "Party" and collectively as the "Parties."

**2.    PURPOSE AND SCOPE**

2.1    <u>Master Contract</u> - This Agreement is a master contract. This Agreement shall control and govern all labor, services, equipment, vehicles, supplies, materials, or products provided by Contractor (collectively, "Work"). When requested by Cimarex and agreed to by Contractor, Contractor shall provide the Work described in a Work Order.

2.2    <u>Non-Exclusive Agreement</u> - This is a non-exclusive agreement. Each Party may contract with other entities or persons for the same type or similar services as those offered by Contractor. This Agreement does not bind Cimarex to request Work, nor does it require Contractor to agree to perform Work if requested. However, whenever Contractor performs any Work for Cimarex, this Agreement shall govern and control unless the Parties (through authorized officers of each) agree otherwise in writing.

2.3    <u>Prior Agreement(s)</u> - This Agreement shall terminate and replace any previous agreement(s) for Work between the Parties.

**3.    DEFINITIONS**

(a)    "Claim" or "Claims" means, unless specifically provided otherwise, all claims (including, but not limited to, those arising out of property damage, personal injury, illness and death), damages, liabilities, losses, demands, liens, encumbrances, fines, penalties, causes of action of any kind (including actions in rem or in personam), obligations, costs, judgments, interest and awards (including payment of attorneys' fees and costs of litigation) or amounts, of any kind or character, whether under judicial or administrative proceedings or otherwise, arising out of, or incident to or in connection with (i) this Agreement and/or (ii) the Work, including, but not limited to, those which arise out of or are directly or indirectly connected with, if applicable, maritime services, vessels and/or the ownership, possession, management, manning, maintenance, supply, operation (including, but not limited to, ingress, egress, loading and unloading operations) or navigation of any vessel.

(b)      "Cimarex" shall mean Cimarex Energy Co. and (but only pursuant to Section 18.1) any of its subsidiary, related, and affiliated entities, including, but not limited to, Magnum Hunter Production, Inc.; Cimarex Energy Co. of Colorado; Key Production Company, Inc.; Prize Energy Resources, L.P.; and Prize Operating Company. Each such subsidiary, related, and affiliated entity may, pursuant to Section 18.1, request Work, which shall be governed by this Agreement. In such cases, the term "Cimarex" shall refer to the specific Cimarex entity requesting the Work.

(c)      "Cimarex Group" means Cimarex, its parent, subsidiary, related and affiliated entities, and its co-owners, partners, co-venturers, joint-venturers, if any, contractors, subcontractors, suppliers, and/or vendors (other than members of Contractor Group), and the officers, directors, employees, agents, assigns, representatives, managers, consultants, insurers, subrogees and invitees of all of the foregoing.

(d)      "Contractor Group" means Contractor, its parent, subsidiary, related and affiliated entities, and its and all of their co-owners, partners, co-venturers, joint-venturers, if any, contractors, subcontractors, suppliers, and vendors of any tier (other than any members of Cimarex Group), and the officers, directors, employees, agents, assigns, representatives, managers, consultants, insurers, subrogees and invitees of all of the foregoing.

(e)      "Third Party" or "Third Parties" means a person or entity other than members of Cimarex Group and Contractor Group.

(f)      The term "*REGARDLESS OF FAULT*" means **WITHOUT REGARD TO THE CAUSE OR CAUSES OF ANY CLAIM, INCLUDING, WITHOUT LIMITATION, EVEN THOUGH A CLAIM IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE, GROSS, OR OTHERWISE), STRICT LIABILITY, OR OTHER FAULT, BREACH OF WARRANTY OR CONTRACT (INCLUDING BREACH OF THIS AGREEMENT) OF ANY MEMBER OF CIMAREX GROUP, CONTRACTOR GROUP, AND/OR THIRD PARTIES, AND WHETHER OR NOT CAUSED BY A PRE-EXISTING CONDITION OR THE UNSEAWORTHINESS OF ANY VESSEL OR UNAIRWORTHINESS OF ANY AIRCRAFT OF A PARTY WHETHER CHARTERED, OWNED, OR PROVIDED BY CIMAREX GROUP OR CONTRACTOR GROUP (BUT SPECIFICALLY EXCLUDING THE WILLFUL MISCONDUCT OF ANY INDEMNIFIED PARTY).**

(g)      "Work Order" means a verbal or written request from Cimarex to Contractor to perform Work.

(h)      "Work Site" means any location(s) at which Contractor performs any part of the Work.

## 4.    TERM AND TERMINATION

4.1      Term - This Agreement shall be effective as of the Effective Date and shall continue in force thereafter until either Party terminates this Agreement for any reason upon thirty (30) days' advance written notice given to the other Party. Such termination shall not affect any Work in progress at the time of such termination unless Cimarex, in its sole discretion, decides otherwise.

4.2     Optional Termination of Work Order - Cimarex may, in its sole discretion, terminate any particular Work Order, at any time, upon verbal notice. In the event of such termination, Contractor shall be entitled to payment as set out in Article 7 for that part of the Work performed in accordance with this Agreement and the applicable Work Order, together with the direct and reasonable costs as agreed between the Parties at the time of termination.

4.3     Default Termination - Notwithstanding the foregoing in this Article 4, if Contractor, after receiving authorization from Cimarex, fails to commence performing the Work in a timely manner, or to diligently prosecute same once commenced, or Contractor breaches any of the material obligations set forth in this Agreement, Contractor shall be considered in default and Cimarex may immediately terminate this Agreement or any Work Order. If Cimarex terminates this Agreement or any Work Order due to Contractor's default, Contractor shall be entitled to payment as set out in Article 7 for only that part of the Work performed in accordance with this Agreement and the applicable Work Order. Any additional costs incurred by Cimarex in connection with remedying a default or such a termination shall be recoverable from Contractor. If, anytime under this Section 4.3, Contractor does not send a properly supported invoice within six (6) months after performing Work, Cimarex shall have no obligation to pay Contractor.

## 5.     WORK COVERED BY THIS AGREEMENT

All Work requested by Cimarex and accepted by Contractor shall be subject to a Work Order. The Work Order may provide, where applicable, a description of the Work to be performed, applicable specifications, the consideration to be paid, the job location, equipment, services, supplies, and personnel to be provided by Contractor, and the items, if any, to be furnished by Cimarex. If written, the Work Order may be in a form similar to that shown in Exhibit "A-1," or any other form that is agreed to by the Parties. Regardless of the form, nothing in any Work Order shall modify or change the terms contained in this Agreement, which shall at all times govern and control unless the Work Order is in writing references the specific provision(s) of this Agreement to be modified, and is executed by authorized representatives of the Parties. Any such modification shall be effective only with respect to that particular Work Order and no other. Although Cimarex may, from time to time, sign or receive Contractor's field tickets, forms for receipt, acknowledgments, invoices, terms of service, or similar forms or documentation, the terms and conditions associated with such forms (by whatever title) shall not amend, modify, waive, override, or release any provision of this Agreement or any Work Order.

## 6.     CHANGES AND/OR ADDITIONS TO THE WORK

Cimarex may order additions, or make changes, to the scope of Work. Contractor shall not change or perform extra work unless authorized by Cimarex. This authorization shall state the extension of time, if any, allowed and specifically provide for the cost for this addition or change to the Work, which shall be either:

(a)     A fixed sum agreed upon in writing or otherwise before such Work is performed; or

(b)     In accordance with the rates contained in the Work Order; or if not applicable

(c)     Contractor's Rate Schedule, attached as Exhibit "B."

A daily statement of such additions or changes to the Work shall be delivered to Cimarex in accordance with the provisions of Article 7.

## 7.     PAYMENT

7.1     Consideration – For Contractor's performance of Work, Cimarex shall pay to Contractor either:

(a)     An amount determined in accordance with either the rates set forth in the Work Order, or, if not so provided for, the Contractor's Rate Schedule, set forth in Exhibit "B"; or

(b)     A fixed sum set forth in the Work Order, which may incorporate, but is not limited to, bid and award documents. Changes to the fixed sum shall be made pursuant to Article 6; or

(c)     An amount agreed to in the Work Order that may include a discount to the Rate Schedule or a discount provided elsewhere for specific periods or particular Work.

7.2     Terms of Payment - Cimarex shall pay to Contractor the consideration described in Section 7.1, as follows:

(a)     When Work is performed, Contractor shall furnish work tickets each day (on a form acceptable to Cimarex) to Cimarex's Representative for verification of the Agreement, job location, equipment description, materials, or supplies furnished, names of Contractor's employees, and the number of hours worked. All work tickets shall be prepared in strict accordance with the classifications contained in the Contractor's Rate Schedule, Exhibit "B."

(b)     Contractor shall render invoices to Cimarex upon completion of the Work, or monthly if the Work lasts longer than a month. Contractor's invoices must be in accordance with, and expressly reference, this Agreement, and must have sufficient detail for identification and comparison with Contractor's daily work tickets, this Agreement, and Exhibit "B."

(c)     After completion of the Work in accordance with this Agreement, Cimarex shall pay Contractor all money due, and not previously paid, upon receipt of the following, if requested by Cimarex:

(i)     Written certification and evidence of Contractor's compliance with all existing laws and/or regulations of all governmental and regulatory bodies with respect to the Work.

(ii)     Satisfactory evidence of Contractor's payment of all bills, claims, and obligations for labor, materials, or services incurred in connection with the Work; and or satisfactory evidence of Contractor's performance of the Work; which shall be determined by Cimarex in its sole discretion.

(iii)     Satisfactory evidence that no liens have been filed or recorded against Cimarex, Cimarex's property, or the property subject to this Agreement.

(iv)    A release by an officer of Contractor, signed before a notary and two witnesses, releasing Cimarex, its officers, agents, employees, and persons for whom Cimarex is responsible from all known claims of the Contractor arising under this Agreement.

(d)    Payment by Cimarex to Contractor for completion or partial completion of Work shall not be deemed acceptance of such Work or any part thereof, nor shall such payment relieve Contractor of any obligation or waive any of Cimarex's rights.

(e)    All invoices and payments shall be sent to the applicable Party as set forth in Article 17.

7.3    <u>Time For Payments</u> - Payments of undisputed amounts shall be made no later than sixty (60) days after Cimarex has received an invoice, in proper form, evidencing that such amounts are due.

7.4    <u>Disputed Amounts</u> - If, prior to payment, Cimarex intends to dispute an invoice, it shall notify Contractor, specifying the reason(s) therefor. Cimarex's payment of the disputed item may be withheld until settlement of the dispute, but payment shall be made of any undisputed portion. Alternatively, Cimarex may pay the disputed amount without waiver of any of its rights, including the right to seek reimbursement. Failure to give notice of a dispute or to withhold payment of all or part of an invoice, shall not limit Cimarex's right to subsequently contest the propriety or accuracy of any invoice, or in any way limit Cimarex's rights under this Agreement or otherwise.

## 8.    RELATIONSHIP OF THE PARTIES/REPRESENTATIVES

8.1    <u>Independent Contractor</u> - Contractor warrants: (a) Contractor shall be an independent contractor and not an agent, partner, or joint-venturer of Cimarex in connection with this Agreement and any Work; (b) nothing contained in this Agreement shall create or be deemed to create any such relationship between Cimarex and Contractor; (c) Contractor shall have full and complete care, custody, and control over all Work, Work Sites, and all other modalities of the Work, the supervision and safety of all of its personnel, and the step-by-step details of the Work, with no right being reserved by Cimarex to direct the method or manner of any Work (as opposed to the results to be obtained); (d) Contractor shall have no authority to hire any persons on behalf of Cimarex, and any and all persons whom Contractor may employ shall be solely the employees of Contractor; (e) Contractor shall have the control and management of the Work, the selection of employees, and the fixing of their hours of labor; (f) nothing contained in this Agreement shall be construed to authorize Contractor to incur any debt, liability, or obligation of any nature for or on behalf of Cimarex; and (g) neither Contractor nor any member of Contractor Group is under the control or supervision of Cimarex (or any member of Cimarex Group).

8.2    <u>Statutory Employer</u> - Notwithstanding (but without limiting) Section 8.1, in all cases where Contractor's employees (defined to include Contractor's direct, borrowed, special, or statutory employees) are covered by a state's worker's compensation law (such as the Louisiana Worker's Compensation Act, La. R.S. § 23:1021 et seq., or similar statute or law of another jurisdiction), all Work performed by Contractor and its employees pursuant to this Agreement is an integral part of and is essential to the ability of Cimarex to generate Cimarex's goods, products, and services. Therefore, Cimarex is the statutory employer of Contractor's employees, pursuant to La. R.S. § 23:1061(A)(3) or similar statute or law of another jurisdiction. Irrespective of Cimarex's

status as the statutory employer or special employer, pursuant to La. R.S. § 23:1031(C) or similar statute or law of another jurisdiction, of Contractor's employees, Contractor shall remain primarily responsible for the payment of the worker's compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from Cimarex. Contractor shall release, indemnify and hold harmless Cimarex Group for any Worker's Compensation payments made by or on behalf of Cimarex to Contractor's employees.

   8.3   Contractor Representative - Contractor, by written notice to Cimarex, shall designate one or more Contractor representatives (collectively, "Contractor Representative") who shall be authorized to act on behalf of Contractor. The Contractor Representative shall be authorized to bind Contractor to any Work Order issued pursuant to this Agreement. Copies of this Agreement shall be furnished by Contractor to the Contractor Representative who shall have access to the Agreement at all times; provided, however, that neither the Contractor Representative nor any Contractor field personnel shall have the authority to amend, modify, change or otherwise vary the terms of this Agreement or to bind Contractor to any risk allocation obligations.

   8.4   Cimarex Representative - Cimarex, by written notice to Contractor, may designate one or more Cimarex representatives (collectively, "Cimarex Representative") who shall be authorized to act on behalf of Cimarex. The Cimarex Representative shall be authorized to certify, on behalf of Cimarex, periodic estimates of Work completed that are submitted by Contractor and to bind Cimarex to any Work Order issued pursuant to this Agreement; provided, however that neither the Cimarex Representative nor any Cimarex field personnel shall have the authority to amend, modify, change or otherwise vary the terms of this Agreement, or to bind Cimarex to any risk allocation obligations.

## 9.   CERTAIN OBLIGATIONS OF CONTRACTOR

   9.1   Contractor-Furnished Items – Contractor shall furnish, within the payments agreed in Article 7, all machinery, tools, spare parts, transportation, and any other items necessary for the performance and timely completion of the Work (other than such items that Cimarex specifically agrees in the Work Order to furnish). All items to be incorporated into the Work shall be suitable for the Work and new, unless otherwise specified. Cimarex furnished items will be delivered to Contractor at the Work Site or other mutually agreed upon location(s), and Contractor shall verify the delivery, shall perform a reasonable visual inspection of such items, shall notify Cimarex of shortages or items delivered in an apparent damaged condition, and shall, thereafter, protect such items from loss or damage.

   9.2   Personnel - Contractor personnel including personnel of subcontractors shall be skilled in their licenses and trades, properly equipped, trained in safety, and capable of carrying out the correct performance and timely completion of the Work. Contractor shall maintain strict discipline of its personnel.

   9.3   Commencement and Completion of Work - If Contractor fails to timely commence the Work consistent with the applicable Work Order, or after such commencement abandons the Work, or for any reason suspends or refuses to continue the Work, unless prevented from commencing or continuing the Work by Force Majeure or by any failure or delay on the part of Cimarex, then Cimarex shall have the right to take over the Work and all materials, equipment and supplies furnished by Contractor and complete the Work or cause the Work to be completed. In such cases, Contractor shall be paid only (a) the reasonable compensation for Work actually provided less (b) the difference, if any, between the actual cost required to complete the Work by Cimarex or another contractor and the price initially agreed upon by Cimarex and Contractor for

such Work; and in the event that such difference exceeds the reasonable compensation for the Work, Contractor shall timely pay such difference to Cimarex.

9.4 <u>Permits</u> - Unless otherwise specified in the Work Order, Contractor shall obtain and pay for, and shall cause Contractor's subcontractors to obtain and pay for, at its and their cost, all necessary permits, licenses and similar authorizations for Contractor, Contractor's subcontractors and their employees that are required to be obtained in their respective names in connection with the performance of the Work. If any governmental body finds any violation upon inspection of the Work or Work Site, which violation is in any way related to Contractor Group, Contractor shall take corrective action immediately at Contractor's sole cost and expense — including, but not limited to, payment of fines, without limitation of any rights of Cimarex.

9.5 <u>Review of Work/Correction</u> - Subject to Section 8.1, Cimarex may review the Work at any time to ensure Contractor's compliance with this Agreement and the applicable Work Order. However, Cimarex's failure to review, to discover, or to reject non-conforming or defective Work shall not imply either acceptance thereof or a waiver of any rights under this Agreement. If the Work is not in compliance, Cimarex, in its sole discretion, may provide Contractor with a list (or otherwise notify Contractor) of all items not in compliance, and Contractor will timely and diligently correct such items. Contractor shall bear the expense of dismantling, repairing and replacing any non-conforming or defective Work and restoring the Work to its proper condition. If it is not practical for Contractor to make such corrections, or Cimarex otherwise desires, Cimarex shall have the right to engage another person or entity, at the sole cost and expense of Contractor, for any dismantling, repairing and replacing of non-conforming or defective Work. Any acceptance by Cimarex of non-conforming Work shall not relieve Contractor of any guarantees or obligations, or waive any of Cimarex's rights.

9.6 <u>Liens and Encumbrances</u> - Contractor shall pay all costs and charges of Contractor Group and/or any other entities or persons from which Contractor receives goods and/or services in connection with this Agreement and/or the Work, and shall allow no lien, attachment, or other encumbrance asserted by any such entities or persons to be fixed upon Cimarex, Cimarex's property, or any property subject to this Agreement. Further, **CONTRACTOR SHALL BE RESPONSIBLE FOR, AND SHALL RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS CIMAREX GROUP FROM ANY AND ALL CLAIMS ARISING OUT OF ANY WORK PERFORMED BY ANY MEMBER OF CONTRACTOR GROUP AND/OR ANY OTHER PERSON FROM WHICH CONTRACTOR RECEIVES GOODS OR SERVICES IN CONNECTION WITH THE PERFORMANCE OF THIS AGREEMENT AND/OR THE WORK**. If any such lien, attachment or other encumbrance is filed as a result of Contractor's or its subcontractor's failure to pay for labor, materials, services, or supplies, upon receipt of written notification thereof, whether from Cimarex or otherwise, without limiting the generality of the foregoing, within thirty (30) days after receipt of such written notice of the existence of such lien, attachment or other encumbrance, Contractor shall remove, by payment or by posting and recording statutory or other bonds satisfactory to Cimarex, any and all liens, attachments, or other encumbrances filed or recorded by any subcontractor (or any employee, agent or subcontractor of a subcontractor), vendor, or any other entity or person from which Contractor receives goods or services in connection with the performance of this Agreement that burdens or encumbers Cimarex, Cimarex's property, or the property subject to this Agreement. If Contractor fails or refuses to take such steps as may be deemed by Cimarex to be necessary to remove any such lien, attachment, or encumbrance, Cimarex shall have the right to take any action to remove such lien, attachment, or encumbrance, by posting and recording statutory or other bonds, or by payment, and deducting the cost of such from any money due or to become due to Contractor under this Agreement. Cimarex will not pay any such claim or indebtedness as long as it is being actively contested by Contractor and Contractor has taken reasonable

actions (including the posting of a bond when appropriate) sufficient to fully protect the property interests of Cimarex and any other person or entity affected by such claim or indebtedness.

9.7    Taxes - Contractor shall pay all taxes (including, but not limited to, the withholding of payroll taxes), licenses, and fees levied or assessed on any member of Contractor Group by any governmental body based upon the wages or salaries paid by any member of Contractor Group to its agents, employees and/or representatives in connection with or incident to the performance of this Agreement, including, but not limited to, unemployment compensation insurance, old age benefits, pensions, social security or any other similar taxes or payments, together with any fines, penalties or liens assessed in connection therewith. Contractor shall require the same actions by all members of Contractor Group, and Contractor shall be liable for any breach of these provisions by any members of Contractor Group. Contractor will timely pay all sales tax or similar taxes to the proper taxing jurisdictions. If Contractor is unable to remit such taxes, Contractor will promptly notify Cimarex's Tax Department in writing of such inability. Contractor shall separately identify on any invoice all sales tax or similar taxes paid, or to be paid, by Contractor. Notices pursuant to this Section 9.7 shall be sent to:

> Tax Department
> Cimarex Energy Co.
> 1700 Lincoln Street, Suite 3700
> Denver, CO 80203

9.8    Further Assurances - At Cimarex's sole discretion, and as a prerequisite to the commencement or continuance of any Work, Contractor may be required by Cimarex to obtain: (a) a Performance and Payment Bond in an amount, and with a surety company, acceptable to Cimarex; (b) an acceptable irrevocable letter of credit in favor of Cimarex; or (c) any other assurance acceptable to Cimarex in its sole discretion. Cimarex shall reimburse Contractor for the reasonable cost of obtaining such assurance.

## 10.    CERTAIN WARRANTIES

10.1    General Services Warranty – Contractor warrants that the Work shall be performed in a good and workmanlike manner and in full compliance with all applicable laws and regulations, and Cimarex's requirements and specifications, if any, applicable to said Work. "Workmanlike manner" means performed in a manner deemed proficient by those with the special knowledge, training, and experience to judge such services. Contractor further warrants that all of the members of Contractor Group will be properly and adequately trained and licensed to perform the Work competently and safely, and that Contractor will provide to Cimarex, upon request, documentation to confirm such training, licensing, safety programs or history, and any other documentation reasonably requested by Cimarex, including, but not limited to, that necessary to comply with any applicable governmental reporting requirements. Contractor shall re-perform any nonconforming services at Contractor's sole cost and expense in accordance with the requirements of this Agreement, or, at Cimarex's option, refund to Cimarex that portion of the consideration that is attributable to the nonconforming Work. If Cimarex elects to have Contractor re-perform the nonconforming Work, Contractor shall promptly commence and complete such re-performance. If Contractor fails to commence or complete such re-performance to the satisfaction of Cimarex within a reasonable period of time after Cimarex's request, then Cimarex shall have the right to have the nonconforming Work re-performed by any other Third Party (or by Cimarex's own employees), and Contractor shall be responsible for all reasonable costs and expenses incurred as a result of such re-performance. This service warranty period shall be eighteen (18) months from the date on which the Work was completed, or such longer period as may be agreed to by the Parties.

10.2    Products Warranty – Contractor warrants that any and all products, equipment (specifically excluding rental equipment, which is addressed below) and materials, including service-related materials, provided by Contractor Group, are free from defects, are in full compliance with the applicable specifications, if any, and that such products, equipment, and materials shall comply with all applicable laws, regulations, rules, standards and codes, whether governmental or industry. Contractor promptly will repair or replace, at Contractor's sole cost and expense and to the reasonable satisfaction of Cimarex, any products, equipment or materials that are defective or non-conforming. The products warranty shall be eighteen (18) months from the date on which the products, equipment and materials where delivered to Cimarex, or twelve (12) months from the date same were put in service, whichever occurs first, or such longer period as may be agreed to by the Parties.

10.3    Rental Equipment Warranty – Contractor warrants that all equipment rented to Cimarex shall meet or exceed the applicable equipment specifications upon delivery, be in good working condition throughout the rental period, and, if requested by Cimarex, shall include operating manuals, supplies, and spare parts. Contractor shall waive and be responsible for rental payments during any time period that equipment fails to operate properly or is otherwise inoperable through no fault of Cimarex Group. In all instances Contractor shall respond in a timely manner to repair or replace the equipment.

10.4    Citizenship of Contractor's Personnel - Contractor warrants that none of Contractor's personnel who perform Work are unauthorized aliens as defined in The Immigration Reform and Control Act of 1986 and the rules and regulations promulgated pursuant thereto, all as amended from time to time. Contractor shall, as required, obtain a  similar warranty from its contractors or subcontractors performing Work related to this Agreement. If requested by Cimarex, Contractor also shall provide proof of citizenship of Contractor's and/or its subcontractors' personnel, who perform Work.

10.5    Familiarity with the Work - Contractor warrants it is familiar with and understands the nature of the Work, the environment, and the difficulties which may be incident to performing the Work; and, upon arriving at the Work Site, but prior to commencing Work, Contractor will conduct an inspection of the Work Site. Contractor is responsible for initiating, maintaining, and supervising all necessary safety precautions and programs in connection with its Work. Contractor shall comply, and, shall cause its employees, agents, subcontractors, and invitees entering on Cimarex's premises in connection with the Work to comply with all of Contractor's own safety rules, with all of Cimarex's safety rules, and with all regulations, precautions, and procedures required by applicable law, rules, or regulations, with industry best management procedures, including employing industry standard protective equipment and devices.

## 11.    RELEASE, DEFENSE, INDEMNITY, AND HOLD HARMLESS

11.1    Cimarex's Indemnity of Contractor Group - **CIMAREX SHALL BE RESPONSIBLE FOR, AND SHALL RELEASE, PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS CONTRACTOR GROUP FROM AND AGAINST ANY AND ALL CLAIMS ARISING OUT OF THIS AGREEMENT AND/OR THE WORK, WHERE SUCH CLAIMS ARISE OUT OF:**

        (a)    **DAMAGE TO OR LOSS OF ANY EQUIPMENT OR PROPERTY OF CIMAREX (EXCEPT AS STATED IN SECTION 11.2); AND**

   (b) **PERSONAL INJURY, ILLNESS, OR DEATH OF ANY EMPLOYEE OF CIMAREX;**

*WITH (a) AND (b) APPLYING REGARDLESS OF FAULT.*

  11.2 <u>Contractor's Indemnity of Cimarex Group</u> - **CONTRACTOR SHALL BE RESPONSIBLE FOR, AND SHALL RELEASE, PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS CIMAREX GROUP FROM AND AGAINST ANY AND ALL CLAIMS ARISING OUT OF THIS AGREEMENT AND/OR THE WORK, WHERE SUCH CLAIMS ARISE OUT OF:**

   (a) **DAMAGE TO OR LOSS OF (I) EQUIPMENT AND/OR PROPERTY OF ANY MEMBER OF CONTRACTOR GROUP, (II) ANY EQUIPMENT AND/OR PROPERTY BEING TRANSPORTED BY CONTRACTOR GROUP, (III) THE WORK, AND (IV) DAMAGE TO OR LOSS OF PROPERTY OF COMPANY ARISING FROM A DEFECT IN CONTRACTOR'S SUPPLIES, MATERIALS, AND/OR PRODUCTS  COMPRISING THE WORK; AND**

   (b) **PERSONAL INJURY, ILLNESS, OR DEATH OF ANY MEMBER OF CONTRACTOR GROUP;**

*WITH (a) AND (b) APPLYING REGARDLESS OF FAULT.*

  The obligations set forth in this Section 11.2 shall apply even if any member of the Contractor Group is determined to be the statutory or borrowed employee of any member of the Cimarex Group, under Louisiana or any other jurisdiction's applicable law.

  11.3 <u>Cimarex's Indemnity of Contractor Group for Environmental Damage</u> - Subject to the obligations contained in Sections 11.1 and 11.2 immediately above, and notwithstanding any other provisions of this Agreement to the contrary, **CIMAREX SHALL BE RESPONSIBLE FOR, AND SHALL RELEASE, PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS CONTRACTOR GROUP FROM AND AGAINST ALL CLAIMS FOR THE COST OF CONTROL, REMOVAL, RESTORATION, AND CLEANUP OF ALL POLLUTION OR CONTAMINATION THAT ORIGINATES FROM ANY PROPERTY OWNED BY CIMAREX, *REGARDLESS OF FAULT*.**

  11.4 <u>Contractor's Indemnity of Cimarex Group for Environmental Damage</u> - Subject to the indemnity obligations contained in Sections 11.1 and 11.2 immediately above, and notwithstanding any other provisions of this Agreement to the contrary, **CONTRACTOR SHALL BE RESPONSIBLE FOR, AND SHALL RELEASE, PROTECT, DEFEND, INDEMNIFY, AND HOLD HARMLESS CIMAREX GROUP FROM AND AGAINST ALL CLAIMS FOR THE COST OF CONTROL, REMOVAL, RESTORATION, AND CLEANUP OF ALL POLLUTION OR CONTAMINATION THAT ORIGINATES FROM ANY PROPERTY OWNED OR PROVIDED BY ANY MEMBER OF THE CONTRACTOR GROUP, *REGARDLESS OF FAULT*.**

  11.5 <u>Damage to Third Parties</u> - Subject to the indemnity obligations contained in Sections 11.1, 11.2, 11.3, and 11.4 immediately above, and notwithstanding any other provisions of this Agreement to the contrary, each Party shall be responsible for, and shall release, protect, defend, indemnify, and hold harmless the other Party and its Group from and against, any Claim involving damage to property or personal injury or death to any Third Party, to the extent the claim is caused by (and in the proportion of) the negligence or fault (if any) of the Parties.

11.6   <u>Removal of Debris and Wreckage</u> - Contractor shall promptly remove all debris and wreckage of the property of Contractor Group if requested by Cimarex. **CONTRACTOR SHALL BE RESPONSIBLE FOR, AND SHALL RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS THE CIMAREX GROUP FOR THE COSTS OR REMOVAL OF CONTRACTOR GROUP PROPERTY AND FROM AND AGAINST CLAIMS ARISING OUT OF OR RESULTING FROM ANY OBLIGATION WHATSOEVER TO REMOVE SAID DEBRIS OR WRECKAGE, *REGARDLESS OF FAULT.***

11.7   <u>Intellectual Property</u> - In addition to any other indemnity provisions contained in this Agreement, Contractor represents and warrants that the use or construction of any Work does not infringe on any license or patent issued or applied for. Contractor shall release, protect, defend, indemnify, and hold harmless Cimarex Group from and against any and all Claims in favor of or made by an alleged owner of intellectual property rights or any claimant of any rights or priority to such tools or equipment, or the use or construction thereof, that may result from or arise out of furnishing or the use of any such tools, equipment, materials, and facilities furnished by Contractor Group, except to the extent such Claims result directly and exclusively from Contractor's compliance with: (a) designs and/or specifications furnished by Cimarex (unless originated with Contractor) or (b) specific written instructions given by Cimarex, for the purpose of directing the manner in which Contractor shall perform the Work.

11.8   <u>Equipment or Instruments Lost in Well</u> - Notwithstanding Section 11.2, if equipment or instruments of Contractor Group are lost in the well below the rotary table, Cimarex shall, at its sole option, either attempt to recover same without cost to Contractor Group, or pay the depreciated cost of the equipment or instruments, but only to the extent such loss is not (a) caused by the negligence or fault of Contractor Group, (b) caused by a defect in the equipment or instruments, or (c) insured by Contractor Group.

11.9   <u>Contractor's Obligation and Indemnification of Cimarex</u> - Contractor warrants that it shall comply, and shall ensure that all members of the Contractor Group comply, with all federal, state, tribal, county, municipal and other laws, rules, regulations, and ordinances applicable to the performance of this Agreement. Contractor shall keep itself current on all notices required under worker's compensation laws and other laws, ordinances, rules, or regulations of any governmental body having jurisdiction over the Work. Contractor shall be responsible for, and shall defend, protect, release, indemnify, and hold harmless Cimarex Group against fines, penalties, and other similar assessments imposed or assessed against Contractor Group or Cimarex Group as a result of Contractor Group's failure to comply with any applicable laws, rules, regulations, or ordinances.

11.10   <u>Insurance in Support of Indemnities</u> – Each Party's obligations in this Article 11 and elsewhere in this Agreement shall be supported (but not limited) by liability insurance that each Party shall obtain and maintain at its own cost (including deductibles) for the benefit of the other Party and its respective Group as indemnitees, with minimum limits and coverages not less than those required under Exhibits "C-1" and "C-2."

11.11   <u>Consequential Damages</u> - **NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT, EACH PARTY (AS INDEMNITOR) RELEASES THE OTHER PARTY AND ITS GROUP FOR THE INDEMNITOR'S INDIRECT, INCIDENTAL, AND CONSEQUENTIAL DAMAGES RESULTING FROM OR ARISING OUT OF THIS AGREEMENT AND/OR THE WORK, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFIT, LOSS OF PRODUCT, LOSS OR INABILITY TO USE PROPERTY AND EQUIPMENT, AS WELL AS BUSINESS INTERRUP-TION AND LOST OPPORTUNITY, HOWEVER SAME MAY BE CAUSED, AND *REGARDLESS OF FAULT.***

11.12   Third-Party Beneficiaries - The Parties intend to create a third-party beneficiary obligation in favor of the members of each Party's respective Group, but to no others, as respects this Article 11.

11.13   Attorneys' Fees - If either Party fails to furnish a defense and indemnity as provided for in this Agreement, the other Party shall be entitled to receive from the offending Party, in addition to its attorneys' fees, costs, expenses and any amounts paid in judgment or settlement, all costs, expenses, and attorneys' fees incurred in the enforcement of this Agreement. Furthermore, the prevailing Party in any litigation relating to this Agreement, other than that involving defense and indemnity, which is addressed above, shall be entitled to recover its reasonable and necessary attorneys' fees and costs of litigation from the other Party.

11.14   Indemnity Severability - Without limiting the generality of Article 26, if it is judicially determined under applicable law that a release, defense, indemnity, or hold harmless protection in this Article 11 is to any degree void or unenforceable, Contractor's obligation to release, defend, indemnify, and hold Cimarex Group harmless shall apply (a) except in the case of a member of Cimarex Group's sole negligence; (b) to Claims arising out of Contractor's negligence, fault, breach of contract, breach of warranty, or breach of applicable law; and/or (c) to the maximum degree permitted by applicable law, whichever of (a), (b), or (c) provides the most protection and recovery to Cimarex Group under the applicable law.

## 12.   **INSURANCE**

12.1   Insurance to be Carried - Contractor shall maintain at its sole cost the insurance coverage set forth in Exhibit "C-1" with companies having an A.M. Best's rating of "A-" and VII or better (or other reputable insurance rating organization of "secure" or better) with full policy limits applying, but not less than as stated in Exhibit "C-1." Cimarex shall maintain at its sole cost the insurance coverage set forth in Exhibit "C-2" with companies having an A.M. Best's rating of "A-" and VII or better (or other reputable insurance rating organization of "secure" or better) with full policy limits applying, but not less than as stated in Exhibit "C-2." The cost of all insurance obligations has been accounted for in the consideration payable under Article 7.

12.2   Waiver of Subrogation, Additional Insured, and Primacy Status - All insurance policies of either Party in any way related to the Work, and whether or not required by this Agreement, shall, but only to the extent of the risks and liabilities assumed by such Party under this Agreement: (a) waive subrogation against the other Party and its Group; (b) (except for Worker's Compensation Coverage and Physical Damage insurances) be endorsed to include the other Party and its Group as additional insureds on a broad form basis (with such additional insured coverage including coverage for the sole or concurrent negligence of the additional insured and not being restricted (i) to "ongoing operations," (ii) to coverage for vicarious liability, or (iii) to circumstances in which the named insured is partially negligent), and (c) be primary and non-contributory to any insurance policies or coverage maintained by or in favor of the other Party and its Group. In addition, the policies of a Party shall be endorsed in a manner which stipulates that the other Party shall not be liable for any premiums or deductibles.

12.3   Insurance Certificates - Prior to commencement of any Work, each Party shall deliver to the other Party a certificate, on an industry standard form, evidencing the required coverages in compliance with this Article 12, provided that neither a Party's acceptance of an incomplete or improper certificate, nor commencement of Work or payment for any Work hereunder, shall constitute a waiver of any rights of the other Party, including, but not limited to, the

right of such Party to monitor and insist on coverages required by this Agreement. Contractor will furnish to Cimarex, and Cimarex will furnish to Contractor upon request, certificates indicating that the required insurance is in full force and effect and that the same shall not be canceled or materially and adversely changed without ten (10) days written notice to the other Party.

12.4    <u>Failure to Carry Insurance</u> - Failure of a Party to keep the required insurance policies in full force and effect during the term of this Agreement and during any extensions shall constitute a material breach of this Agreement, and each Party shall be responsible for whatever coverage should have been obtained. The other Party shall have the right, in addition to any other rights it may have, to immediately terminate this Agreement without further liability to the Party, except as expressly provided for in this Agreement. Should liability coverage be provided on a claims-made basis, the insuring Party shall ensure that either: (a) coverage had historically been provided on occurrence forms, the last policy of which expired immediately prior to the claims-made policy's retroactive date or (b) that the claims-made retroactive date is at least five (5) years previous to the Effective Date of this Agreement.

12.5    <u>Extent of Insurance Coverage</u> - The insurance coverages provided by a Party in fulfillment of these obligations are intended to be as broad as possible. Each Party agrees that in no event will any insurance policy obtained by it exclude coverage for the other Party and its Group because (a) a claim is made alleging (i) personal injury, or death of the insuring Party's employees, (ii) personal injury, death or property damage resulting from the negligence of the other Party, or any member of the Party's Group, or any other entity, or (iii) personal injury, death, or property damage resulting from the sudden or accidental release, discharge or dispersal of chemicals, liquids, gases, or pollutants or (b) the indemnity provisions of this Agreement are inapplicable or otherwise unenforceable. General liability policies providing that defense costs are "within limits" (*i.e.*, so called "eroding" or "vanishing" polices) are not compliant with this Article 12 and shall not be used by Contractor.

12.6    <u>Information to be Provided to Insurers</u> - If Contractor's insurance policies do not have broad Contractual Liability wording and "blanket" provisions for Additional Insured status, primary wording, and waiver of subrogation whereby the policies will automatically be triggered whenever agreed to under written contract, Contractor shall provide a copy of Articles 11 and 12, and Exhibit "C-1" to its insurance carrier(s) and require the carrier(s) to provide insurance coverage that complies with both Articles and Exhibit "C-1."

12.7    <u>Insurance a Separate Obligation</u> - While the scope of certain insurance protection may be defined with reference to the risk allocation obligations in the Agreement, the insurance provisions of this Agreement are, to the extent required by law, separately enforceable, and distinct and severable from any such release defense, hold harmless, or indemnity obligations provisions. To the extent of the risks and liabilities assumed by each Party under this Agreement, the liability insurance provided under the terms of this Agreement is intended to benefit both Parties.

12.8    <u>Insurance No Limit</u> – Unless provided by applicable law, the provisions of this Article 12 shall in no way limit any risk allocation obligations of either Party, and the limits and coverages of any insurance obtained by either Party shall in no way limit the liabilities or obligations assumed by such Party pursuant to this Agreement.

13.    **CONFIDENTIALITY**

13.1    <u>Confidential Information</u> - The Parties, in the course of negotiations and performance of this Agreement and subsequent relationships with each other, may have access to

financial, accounting, statistical, personnel, client, or other technical or business information of the other Party or its subsidiary, related, or affiliated entities, which information is and shall be deemed for all purposes under this Agreement as trade secrets or proprietary. Except as otherwise provided in this Agreement, all such information, including, without limitation, information obtained as a result of performance the Work, shall be considered "Confidential Information."

13.2   Use of Confidential Information - Each Party shall: (a) hold all Confidential Information in confidence; (b) not disclose the Confidential Information to any Third Party without the written consent of the other Party; and (c) use the Confidential Information solely as necessary in connection with the performance of this Agreement. The Parties may disclose Confidential Information to their employees, agents, or subcontractors to whom disclosure is necessary for the purpose of performing the Work, but only under terms and conditions that protect the confidentiality of the Confidential Information as required by this Agreement. The Parties shall be responsible to each other for any unauthorized disclosure of Confidential Information by anyone in its respective Group.

13.3   Exceptions - The obligations imposed by this Agreement shall not apply to any Confidential Information that:

(a)   Is already in the possession of the receiving Party on the Effective Date of this Agreement (except Confidential Information in connection with bids, negotiations, and/or discussions leading to the execution of this Agreement) or is independently developed by the receiving Party;

(b)   Is or becomes publicly available through no fault of the receiving Party;

(c)   Is obtained by the receiving Party from a Third Party, who is under no obligation of confidence to the disclosing Party; and/or

(d)   For which disclosure is required by law, but only after first notifying the disclosing Party of such required disclosure.

13.4   Term of Confidentiality - The obligations set forth in this Article 13 shall survive for a period of five (5) years after (a) termination of the Agreement, or (b) Completion of the Work to which the Confidential Information relates, whichever is later.

## 14.   ASSIGNMENT

Contractor shall have the right, upon written notice, to hire subcontractors to assist in performing the Work, but Contractor shall be responsible for said subcontractors and their performance. However, Contractor shall not assign this Agreement without Cimarex's prior written consent. Any subcontract or assignment shall not relieve Contractor of any liability under this Agreement and may, if in conflict with this Article 14, be void at Cimarex's sole option. Cimarex may assign this Agreement to any parent, subsidiary, related, or affiliated entity, whether now existing or hereafter constituted, or any co-owners, co-lessees, partners, co-venturers, or joint venturers, and Contractor hereby consents to such assignment. This Agreement shall control the Parties' rights and responsibilities when a successor-in-interest to Contractor performs Work for Cimarex.

15.    **FORCE MAJEURE**

15.1    <u>Definition</u> - For the purpose of this Agreement, "Force Majeure" shall mean any occurrence not within the reasonable control of the Party affected, including, by way of illustration, but not limited to, an act of God, an act of the public enemy, strike, lockout, boycott, picketing, riot, insurrection, fire, or any governmental law, order, rule, regulation, or ordinance. Force Majeure shall not include any notion or form of commercial impracticality.

15.2    <u>Obligations Suspended</u> - If either Party is rendered unable, wholly or in part, by Force Majeure to carry out its obligations (except financial obligations) under this Agreement, it is agreed that upon such Party giving notice and reasonably full particulars of such Force Majeure in writing or by facsimile to the other Party within a reasonable time after the occurrence of the alleged Force Majeure, then the obligations of the Party giving such notice, so far as it is affected by such Force Majeure, shall be suspended during the continuance of any inability so caused, but for no longer period, and such cause shall so far as possible be remedied with all reasonable dispatch. The obligation to make payments pursuant to Article 7, shall not be relieved, delayed, or excused by any such Force Majeure condition.

15.3    <u>Labor Disputes</u> - The settlement of strikes and lockouts shall be entirely within the discretion of the Party asserting Force Majeure as the excuse for non-performance, and the above requirement that any Force Majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes or lockouts by acceding to the demands of an opposing Party when such course is inadvisable in the discretion of the Party asserting Force Majeure.

16.    <u>**AUDITS**</u>

Contractor shall maintain during the course of this Agreement, and retain for not less than three (3) years following the end of any calendar year in which the Work in question was performed, complete, and accurate records of all of Contractor's charges and documentation of items that are chargeable to Cimarex under this Agreement. Cimarex shall have the right at any reasonable time during that period and during normal business hours to inspect and audit those records by authorized representatives of its own or any third-party consultant selected by it. The records to be maintained and retained by Contractor shall include all records required to verify the accuracy of Contractor's charges, including, but not limited to, those of Contractor's subcontractors, vendors, suppliers, and/or independent contractors. If such audit reveals a discrepancy between the amount or value of materials or services billed to Cimarex and that which is evidenced by Contractor's books and records, Cimarex shall have the right to adjust its account with Contractor, which adjustment may necessitate a refund of funds disbursed to Contractor. If Cimarex is unable to gain access to any pertinent records of any member of Contractor Group Contractor will expend every effort, at its expense, to assist Cimarex in obtaining this information.

17.    <u>NOTICES</u>

Unless otherwise noted in this Agreement, all notices necessary to be given under the terms of this Agreement, except as otherwise provided, shall be effective upon receipt and shall be in writing and communicated by prepaid mail, electronic mail (e-mail), or facsimile transmission addressed to the respective parties at the address below or to such other address as respectively designated hereafter in writing from time to time:

**General Notices to Cimarex:**

Cimarex Energy Co.
1700 Lincoln Street, Suite 3700
Denver, CO 80203
Attn: Vendor Compliance
vendorcompliance@cimarex.com
Phone: (303) 285-3995
Fax: (303) 295-3494

**Invoices to Cimarex:**

Cimarex Energy Co.
202 S. Cheyenne Ave., Suite 1000
Tulsa, OK 74103
Attn: Accounts Payable
Fax: (918) 585-1133

**To Contractor:**

_____
_____
_____

Attn:
Phone:
Fax:
E-mail:

18.    <u>SUBSIDIARY, AFFILIATED, AND RELATED ENTITIES</u>

18.1    <u>Separate Entities</u> – Cimarex's subsidiary, related, and affiliated entities may request Work pursuant to this Agreement. In such cases, (a) the subsidiary, related, or affiliated entity requesting Work shall be treated as a separate Party under this Agreement, and (b) the word "Cimarex" in this Agreement shall be considered to mean the particular Cimarex entity for which the Work is being performed. The rights, duties, and obligations of Cimarex and its

subsidiary, related, and affiliated entities to the Contractor, and the rights, duties, and obligations of the Contractor to Cimarex and each of its subsidiary, related, and affiliated entities are separate and distinct.

18.2   Invoicing - Contractor shall make billings in the name of the particular Cimarex entity for which the Work was performed.

18.3   Contractor Entities – If any of Contractor's subsidiary, related, or affiliated entities perform Work for Cimarex, such Work shall be governed by this Agreement and Contractor's subsidiary, related, or affiliated entity performing the Work shall be the "Contractor" under this Agreement. However, if such subsidiary, related, and affiliated entity defaults in its obligations under Articles 11 and/or 12, the Contractor entity that is the signatory of this Agreement shall be bound for such performance.

19.   **NO CONFLICTS OF INTEREST**

No Contractor employee, agent, officer, director, family member, or subcontractor shall give, or cause to be given, to any Cimarex employee (or their immediate family) any gift, entertainment, travel, payment, loan, or service. Gifts of nominal value and entertainment, meals and social invitations that are customary and proper under the circumstances and do not place the recipient under obligation, or the appearance of obligation, of any sort, are acceptable. Contractor's employees, agents, officers, directors, family members, or subcontractors shall not provide direct or indirect employment to family members of active employees of Cimarex without written approval of a duly authorized Cimarex officer. Also, any arrangement by Contractor to enter into any direct or indirect business arrangement with any Cimarex employee or agent is prohibited. Cimarex may audit pertinent Contractor, subcontractor, or vendor records to confirm compliance with this paragraph. If Cimarex cannot gain access to pertinent records of any of any member of Contractor Group, Contractor will expend every effort, at Contractor's own cost, to assist Cimarex in obtaining the requested information from Contractor's subcontractors and vendors necessary for a complete audit to confirm compliance with this Article 19.

20.   **CONTRACTOR SAFETY MANAGEMENT**

Contractor shall follow safe working practices and comply with its own safety manual or regulations. Without limiting the above in this Article 20, and subject to Section 8.1 and Section 10.5, Contractor shall, as a baseline minimum, abide by the terms of Exhibit "D." Cimarex's Environmental, Health & Safety Manual, as revised from time to time, can be found at www.cimarex.com/CimarexSafetyManual.pdf and should be reviewed by Contractor on a regular basis.

21.   **SUBSTANCE ABUSE**

Contractor shall comply with industry standard substance abuse programs and its own substance abuse manual or policies. Without limiting the above in this Article 21, and subject to Section 8.1, Contractor shall as a baseline minimum abide by the terms of Exhibit "E." Cimarex's most recent requirements respecting substance abuse, if any beyond those reflected in Exhibit "E," can be found at www.cimarex.com/CimarexSafetyManual.pdf and should be reviewed by Contractor on a regular basis.

22.   **EQUAL EMPLOYMENT OPPORTUNITY**

Contractor shall abide by the terms of Exhibit "F."

23.   **ANNOUNCEMENTS AND PRESS RELEASES**

During and after the term of this Agreement, Contractor shall make no announcements, press releases, or other publications concerning the Work or the Agreement without the prior written consent of Cimarex's authorized officer.

24.   **OWNERSHIP OF DATA**

All data and information related to the Work and generated by or for Contractor and its subcontractors and vendors during the performance of the Work shall be the sole property of Cimarex. Contractor shall destroy all draft copies of reports when subsequent final copies of those reports are generated. All copyrights, design rights, patents, trademarks, trade secrets, and other intellectual property rights resulting solely from the efforts of Contractor under this Agreement shall vest solely in Contractor, but Cimarex shall have a non-exclusive, royalty-free, irrevocable, perpetual license to utilize any such copyrights, design rights, patents, trademarks, trade secrets, and other intellectual property rights in Cimarex's business.

25.   **APPLICABLE LAW**

Contractor's Work for Cimarex may be performed (at times simultaneously) at various locations, and as a result, unless specified here, could be subject to the laws of various jurisdictions. To provide certainty and predictability regarding the interpretation and enforcement of this Agreement, the Parties agree, as a material term of this Agreement, that this Agreement shall be governed by and interpreted in accordance with **THE LAWS OF THE STATE OF TEXAS (EXCLUSIVE OF ANY PRINCIPLES OF CONFLICTS OF LAWS WHICH WOULD DIRECT APPLICATION OF THE SUBSTANTIVE LAWS OF ANOTHER JURISDICTION).** In the event of a dispute over the meaning or application of this Agreement, it shall be construed fairly and reasonably and neither more strongly for nor against either Party.

26.   **GENERAL SEVERABILITY**

If any part, term, or provision of this Agreement is judicially determined to be unenforceable or in conflict with applicable law, the validity of the remaining portions or provisions shall not be affected by such determination. Any term or provision so held to be unenforceable or in conflict with applicable law shall be deemed amended to the minimum extent necessary to comply with such law.

27.   **SURVIVAL**

The indemnity, insurance, audit, warranty, confidentiality, and related provisions of this Agreement (as well as any other provisions as may be identified expressly herein or which by their nature are intended to survive termination) shall survive termination of this Agreement.

28.   **NO WAIVER**

The failure of either Party at any time to require performance by the other Party of any provision of this Agreement shall in no way effect the right of such Party thereafter to enforce the same, nor shall any waiver of any breach of any provision hereof by the other Party be taken or

held to be a waiver by such Party of any succeeding breach of such provision, or as a waiver of the provision itself.

## 29.   PERSONAL CONTRACT

This Agreement shall be deemed a personal contract of Contractor, which waives all benefits of the Shipowner's Limitation of Liability Act, 46 U.S.C. § 183, et seq. or any other similar laws as to Cimarex Group. Neither Contractor nor its underwriters shall be entitled to claim the benefits of such limitation of liability statute in respect of Claims asserted by Cimarex Group. The purpose of this Article is to insure by specific contractual agreement that Cimarex Group is able to enforce all indemnity obligations and insurance coverage for their benefit under this Agreement to the maximum extent permitted by law.

## 30.   SECTION HEADINGS

The article or section headings appearing in this Agreement have been inserted for the purpose of convenience and ready reference. They do not purport to, and shall not be deemed to define, limit, or extend the scope or intent of the provisions to which they appertain.

## 31.   EXHIBITS

The following exhibits are attached hereto and made a part hereof:

Exhibit "A"      - Work
Exhibit "A-1"   - Example Work Order
Exhibit "B"      - Rates for Services
Exhibit "C-1"   - Contractor's Insurance
Exhibit "C-2"   - Cimarex's Insurance
Exhibit "D"      - Contractor Safety Management
Exhibit "E"      - Substance Abuse
Exhibit "F"      - Equal Employment Opportunity

## 32.   CONFLICTS

If a conflict exists between this Agreement and any other writing, this Agreement shall control, unless the other writing specifically references both this Agreement and the Parties' intent that the other writing control, and such other writing is executed by authorized officers of the Parties. Further, if a conflict exists between the body of this Agreement and the Exhibits attached to this Agreement, then the body of this Agreement shall control, unless the Exhibit expressly provides otherwise.

## 33.   ENTIRE AGREEMENT

This Agreement supersedes all prior verbal or written proposals, communications, or other agreements related to the subject matter of this Agreement. This Agreement sets forth the entire agreement between the Parties with regard to the subject matter of this Agreement and no amendment shall be binding upon the Parties unless in writing and signed by authorized officers of both Parties. In addition, in the event of any conflict this Agreement shall control over any subsequent writing between the Parties unless the intent to amend or supersede this Agreement is expressly stated in a writing, referencing this Article 33, and executed by an authorized representative of each Party authorized to amend this Agreement.

34.   <u>COUNTERPARTS</u>

     This Agreement may be executed in multiple counterparts, each of which shall be considered an original once Cimarex and Contractor have executed a counterpart of this Agreement.

**For and on behalf of:**

**CIMAREX ENERGY CO.:**

BY: _____

PRINTED NAME: _____

TITLE: _____

**CONTRACTOR:** _____

BY: _____

PRINTED NAME: _____

TITLE: _____

DATE: _____

**EXHIBIT "A"**

Attached to and made part of the Master Service Agreement

## WORK

**A.1**   **Description of Work:**

**A.2**   **Geographic Limitations (if any):**

**A.3**   **Description of Services, Materials and Other Items to be Supplied by Cimarex:**
Cimarex shall supply no services, materials or other items unless agreed upon by both Parties at the beginning of each assignment.

**A.4**   **Special Provisions:** (if any)

**(NOTE:  This Exhibit "A" should be filled out in detail before execution of the Agreement. Exhibits "A" and "B" may be contained into a single exhibit.)**

**EXHIBIT "A-1"**
Attached to and made part of the Agreement

**EXAMPLE WORK ORDER**
Issued and made pursuant to the Agreement

Cimarex authorizes Contractor to perform the Work described below in accordance with the Agreement.

**Description of the Work**: [insert brief description]

**Payment**: For the performance of the Work described above, Cimarex will pay Contractor those sums _____ [describe basis for payment – standard rates, special rates, attach or list, fixed price/ lump sum – attach schedule / rate sheet / proposal if necessary, or refer to document, as appropriate].

**Schedule**: The Work will commence on or about _____ [insert date or triggering event].

**Special Conditions**: [list such conditions, if any].

**CIMAREX ENERGY CO.**

**By:** _____

**Name:** _____

**Title:** _____

**Date:**_____

**EXHIBIT "B"**

Attached to and made part of the Agreement

## RATES FOR SERVICES

(Which only may be amended from time to time with prior
written approval by Cimarex)

**EXHIBIT "C-1"**

Attached to and made part of the Agreement

**CONTRACTOR'S MINIMUM INSURANCE**

*General Insurance Requirements*

      a.     All insurance policies of Contractor, whether or not required by this Agreement, shall, but only to the extent of the risks, liabilities and/or related to the Work obligations assumed by Contractor under this Agreement: (i) waive subrogation against Cimarex Group; (ii) (except for Worker's Compensation Coverage and Physical Damage insurances) be endorsed to include Cimarex Group as additional insureds on a broad form basis (with such additional insured coverage including coverage for the sole or concurrent negligence of the additional insured and not being restricted to (a) "ongoing operations," (b) coverage for vicarious liability, or (c) circumstances in which the named insured is partially negligent); and (iii) be primary and non-contributory to any insurance policies or coverage maintained by or in favor of any member of Cimarex Group.

      b.     All insurance policies of Contractor shall be endorsed to provide not less than ten (10) days prior written notice to Cimarex in the event of cancellation, material changes, or reduction in coverage in the policies which affect the interests of Cimarex, and the policies shall be endorsed in a manner that stipulates Cimarex shall not be liable for any premiums or deductibles.

      c.     The below specified amounts and types of insurance coverage shall not be deemed to constitute, or be construed as, a limitation on Contractor's liability under the Agreement.

*Specific Insurance Requirements*

      a.     <u>Worker's Compensation Insurance</u> with statutory limits in accordance with all applicable state, federal and maritime laws and regulations applicable to and covering employees of Contractor engaged in the performance of this Agreement, but with limits no less than $1,000,000.

      b.     <u>Employers' Liability Insurance</u> with minimum limits of not less than $1,000,000 per accident/occurrence, $1,000,000 each employee/disease, and $1,000,000 policy limit, including but not limited to an "Alternate Employer" and "Borrowed Servant" endorsement in favor of Cimarex Group. If the operations are over water or where the laws hereinafter mentioned apply, Contractor shall carry the following additional insurance as applicable: U.S. Longshoremen's and Harbor Worker's Compensation Act Liability (including the Outer Continental Shelf Lands Act) for statutory limits, and Maritime Employer's Liability of $1,000,000 per accident/occurrence, including but not limited to coverage for Jones Act, General Maritime Laws and Death on the High Seas Act; Transportation, Wages, Maintenance and Cure; Voluntary Compensation; and an endorsement providing that a claim "in rem" will be treated as a claim "in personam." Such coverage shall include an amended Territory definition to include the Gulf of Mexico.

      c.     <u>Commercial General Liability Insurance</u> with limits of $1,000,000 combined single limit per occurrence and aggregate, if applicable, including but not limited to coverage for public liability including bodily injury and property damage liability, personal/advertising injury, contractual liability for those liabilities assumed by Contractor herein, cross liability and severability of interest,

liability for pollution and cleanup on a sudden and accidental basis, products and completed operations, protective liability/independent contractors/work sublet, and with the "care, custody, and control exclusion" deleted or alternative coverage under a first party property policy for property leased, rented, used and/or in the care, custody, and control of Contractor, and further including cargo insurance for Work components or Cimarex property transported by Contractor.

d.      Automobile Liability Insurance with limits of $1,000,000 combined single limit per accident/occurrence for bodily/personal injury and property damage, including but not limited to coverage for all owned, hired and non-owned vehicles or automotive equipment, or mobile equipment subject to motor vehicle insurance laws used by or for Contractor and contractual liability for those liabilities assumed by Contractor herein, including MCS-90 endorsement for motor vehicle carriers.

e.      Umbrella or Excess Liability Insurance over items (b), (c), (d), (g), and (h), if applicable, with following form coverage over (or coverages at least as broad as) the coverages afforded by the primary policies with minimum limits of $10,000,000 per occurrence and aggregate, if applicable, in excess of specified limits.

f.      Physical Damage Insurance on Contractor's property to the extent of its fair market value with any deductible to be for the account of Contractor, and including removal of wreck/debris coverage.

**IF CONTRACTOR OWNS, CHARTERS, OR HIRES ANY AIRCRAFT IN CONNECTION WITH THE PERFORMANCE OF THE AGREEMENT:**

g.      The Contractor shall carry or require the owner or operator of such aircraft to carry (including the Umbrella Excess Liability Insurance) Aircraft Liability Insurance with limits of $20,000,000 combined single limit per occurrence, including but not limited to coverage for bodily injury, death and property damage, Passenger Liability.

**IF CONTRACTOR OWNS, RENTS, OR LEASES VESSELS OR OTHER MARINE EQUIPMENT AND/OR IF WORK IS PERFORMED IN A MARITIME ENVIRONMENT:**

h.      The Contractor in addition to all applicable insurance coverage provided above shall carry or require the owner or operator of such vessels or other marine equipment to carry the following:

(i)      Protection and Indemnity Insurance on the SP-23 form or equivalent (or Commercial General Liability insurance with watercraft exclusion deleted) coverage covering any vessels used and its equipment with limits not less than $5,000,000 combined single limit per occurrence, including but not limited to coverage for liability for pollution and cleanup on a sudden and accidental basis, full crew coverage, Removal of Wreck on a voluntary basis or where required by law, regulation or contract, Collision and Tower's Liability, and Cargo Legal Liability. The phrase "as owner of vessel named herein" and all similar phrases purporting to limit the insurer's liability to that of an owner shall be deleted and full coverage shall be provided to Cimarex Group without regard to its status as an owner of a vessel. Moreover, any provision allowing an insurer to limit coverage to an additional insured in the event of the application of the Limitation of Liability Statute shall be deleted.

(ii)   <u>Hull insurance</u> on the American Institute Hull Clauses or equivalent with minimum limits not less than the full value of the vessel, and in the event of damage to or loss of such property, including but not limited to coverage for Collision and Tower's Liability, Removal of Wreck on a voluntary basis or where required by law, regulation or contract. The phrase "as owner of vessel named herein" and all similar phrases purporting to limit the insurer's liability to that of an owner shall be deleted. Contractor hereby releases the Cimarex Group and waives any claim for the loss of such property or damage that may result to Contractor in excess of any sum that it may receive from its insurance carrier because of such loss or damage.

(iii)   <u>Charterer's Legal Liability Insurance</u> with limits with not less than $5,000,000 combined single limit per occurrence.

The policies listed in (i), (ii), and (iii) above shall provide that seaworthiness of vessels used in connection with this Agreement is accepted by insurers (or that insurers shall waive in favor of Cimarex Group the vessel owner's and/or Contractor's warranty of seaworthiness).

Contractor shall not hire or charter any vessel in the performance of this Agreement at any time unless said vessel is adequately covered by insurance, as required in this sub-section (h), and is operated within the navigation limits of the insurance policies; in addition, the policies required by this sub-paragraph (iii) shall be endorsed as follows:

(I)   to provide full coverage to Cimarex Group as additional insured without limiting coverage to liability "as owner of the vessel" and to delete any "as owner" clause or any other language purporting to limit coverage to liability of an insured "as owner of the vessel"; and

(II)   to delete any language limiting coverage for Cimarex Group in the event of the applicability of the Limitation of Liability Statute.

i.   To comply with the public policy of Louisiana, upon the request of either Party, the other Party (as the receiving Party) shall cause the requesting Party to be separately invoiced for the cost of extending the insurance protections required herein with respect to the Commercial General Liability and Excess/Umbrella Liability insurance policies. The receiving Party agrees that the amount thus invoiced constitutes all material costs of the insurance protection provided herein.

j.   When any part of the Work is performed by a commercial motor carrier, or requires Contractor or its subcontractors to carry cargo, MCS-90 endorsement and/or cargo insurance, in the minimum amount of the replacement cost of the cargo.

**EXHIBIT "C-2"**

Attached to and made part of the Agreement

**CIMAREX'S INSURANCE**

**General Insurance Requirements**

a.    All insurance policies of Cimarex related to the Work, whether or not required by this Agreement, shall, but only to the extent of the risks, liabilities and/or obligations assumed by Cimarex under this Agreement: (i) waive subrogation against Contractor Group; (ii) (except for Workers' Compensation Coverage, Physical Damage insurances, Operator's Extra Expense, or similar insurances) be endorsed to include Contractor Group as additional insureds on a broad form basis (with such additional insured coverage including coverage for the sole or concurrent negligence of the additional insured and not being restricted to (a) "ongoing operations," (b) coverage for vicarious liability, or (c) circumstances in which the named insured is partially negligent); and (iii) be primary and non-contributory to any insurance policies or coverage maintained by or in favor of any member of Contractor Group.

b.    Cimarex will furnish to Contractor upon request, certificates indicating that the required insurance is in full force and effect and that the same shall not be canceled or materially and adversely changed without ten (10) days written notice to the Contractor.

c.    The below specified amounts and types of insurance coverage shall not be deemed to constitute, or be construed as, a limitation on Cimarex's liability under the Agreement.

***Specific Insurance Requirements***

a.    <u>Worker's Compensation Insurance</u> with statutory limits in accordance with all applicable state, federal and maritime laws and regulations applicable to and covering employees of Cimarex engaged in the performance of this Agreement.

b.    <u>Employers' Liability Insurance</u> with minimum limits of not less than $1,000,000 per accident/occurrence, $1,000,000 each employee/disease, and $1,000,000 policy limit, including but not limited to an "Alternate Employer" and "Borrowed Servant" endorsement in favor of Contractor Group. If the operations are over water or where the laws hereinafter mentioned apply, Cimarex shall carry the following additional insurance as applicable: U.S. Longshoremen's and Harbor Worker's Compensation Act Liability (including the Outer Continental Shelf Lands Act) for statutory limits, and Maritime Employer's Liability of $1,000,000 per accident/occurrence, including but not limited to coverage for Jones Act, General Maritime Laws and Death on the High Seas Act; Transportation, Wages, Maintenance and Cure; Voluntary Compensation; and an endorsement providing that a claim "in rem" will be treated as a claim "in personam." Such coverage shall include an amended Territory definition to include the Gulf of Mexico.

c.    <u>Commercial General Liability Insurance</u> with limits of $1,000,000 combined single limit per occurrence and aggregate, if applicable, including but not limited to coverage for public liability including bodily injury and property damage liability, personal/advertising injury, contractual liability for those liabilities assumed by Cimarex herein, cross liability and severability of interest, liability for pollution and cleanup on a sudden and accidental basis, products and completed operations, protective liability/independent contractors/work sublet, and with the "care, custody,

and control exclusion" deleted or alternative coverage under a first party property policy for property leased, rented, used and/or in the care, custody, and control of Cimarex.

      d.      Automobile Liability Insurance with limits of $1,000,000 combined single limit per accident/occurrence for bodily/personal injury and property damage, including but not limited to coverage for all owned, hired and non-owned vehicles or automotive equipment, or mobile equipment subject to motor vehicle insurance laws used by or for Cimarex and contractual liability for those liabilities assumed by Cimarex herein.

      e.      Umbrella or Excess Liability Insurance over items (b), (c), (d), (f), and (g), if applicable, with following form coverage over (or coverages at least as broad as) the coverages afforded by the primary policies with minimum limits of $10,000,000 per occurrence and aggregate, if applicable, in excess of specified limits.

**IF CIMAREX OWNS, CHARTERS, OR HIRES ANY AIRCRAFT IN CONNECTION WITH THE PERFORMANCE OF THE AGREEMENT:**

      f.      Cimarex shall carry or require the owner or operator of such aircraft to carry (including the Umbrella Excess Liability Insurance): Aircraft Liability Insurance with limits of $20,000,000 combined single limit per occurrence, including but not limited to coverage for bodily injury, death and property damage, Passenger Liability.

**IF CIMAREX OWNS, RENTS OR LEASES VESSELS OR OTHER MARINE EQUIPMENT AND/OR OF WORK IS PERFORMED IN A MARITIME ENVIRONMENT:**

      g.      Cimarex in addition to all applicable insurance coverage provided above shall carry or require the owner or operator of such vessels or other marine equipment to carry the following:

      (i)      Protection and Indemnity Insurance on the SP-23 form or equivalent (or Commercial General Liability insurance with watercraft exclusion deleted) coverage covering any vessels used and its equipment with limits not less than $5,000,000 combined single limit per occurrence, including but not limited to coverage for liability for pollution and cleanup on a sudden and accidental basis, full crew coverage, Removal of Wreck on a voluntary basis or where required by law, regulation or contract, Collision and Tower's Liability, and Cargo Legal Liability. The phrase "as owner of vessel named herein" and all similar phrases purporting to limit the insurer's liability to that of an owner shall be deleted and full coverage shall be provided to Contractor Group without regard to its status as an owner of a vessel. Moreover, any provision allowing an insurer to limit coverage to an additional insured in the event of the application of the Limitation of Liability Statute shall be deleted.

      (ii)      Hull insurance on the American Institute Hull Clauses or equivalent with minimum limits not less than the full value of the vessel, and in the event of damage to or loss of such property, including but not limited to coverage for Collision and Tower's Liability, Removal of Wreck on a voluntary basis or where required by law, regulation or contract. The phrase "as owner of vessel named herein" and all similar phrases purporting to limit the insurer's liability to that of an owner shall be deleted. Cimarex hereby releases the Contractor Group and waives any claim for the loss of such property or damage

that may result to Cimarex in excess of any sum that it may receive from its insurance carrier because of such loss or damage.

(iii)     <u>Charterer's Legal Liability Insurance</u> with limits with not less than $5,000,000 combined single limit per occurrence.

The policies listed in (i), (ii), and (iii) above shall provide that seaworthiness of vessels used in connection with this Agreement is accepted by insurers (or that insurers shall waive in favor of Contractor Group the vessel owner's and/or Contractor's warranty of seaworthiness).

Cimarex shall not hire or charter any vessel in the performance of this Agreement at any time unless said vessel is adequately covered by insurance, as required in this sub-section g, and is operated within the navigation limits of the insurance policies; in addition, the policies required by this sub-paragraph (iii) shall be endorsed as follows:

(I)     to provide full coverage to Contractor Group as additional insured without limiting coverage to liability "as owner of the vessel" and to delete any "as owner" clause or any other language purporting to limit coverage to liability of an insured "as owner of the vessel"; and

(II)     to delete any language limiting coverage for Contractor Group in the event of the applicability of the Limitation of Liability Statute.

**EXHIBIT "D"**
Attached to and made part of the Agreement

## CONTRACTOR SAFETY MANAGEMENT

D.1     Contractor acknowledges that it is performing Work solely as an independent contractor and not as an agent, servant or employee of Cimarex. Subject only to the scope of work provisions of the Agreement and any facility rules of conduct applicable to persons on the premises, it is the responsibility of Contractor to determine the personnel to perform the Work, as well as how and when it should be performed.

D.2     Contractor shall be solely responsible for providing its employees and subcontractors with a safe and healthful workplace and unless otherwise expressly required by law, Cimarex does not assume responsibility for fulfilling any of Contractor's obligations to Contractor's employees and subcontractors. Without limitation, Contractor shall be responsible for: (a) the safety and health of its employees, representatives, subcontractors, subsuppliers, invitees, and agents; (b) abatement of conditions or practices that pose any actual or potential safety or health risk to any of such personnel or entities; and (c) making decisions concerning the safety or health of same. Contractor reserves the right to and shall safely discontinue Work, at any time, should it, its employees, or subcontractors determine that they are exposed to any safety or health risk. Contractor shall support and utilize a policy that all personnel have stop work authority when they witness an unsafe act or condition. Such action on the part of Contractor will not constitute a breach of this Agreement.

D.3     Contractor agrees that upon arriving at the location(s) at which the Work is to be performed, it will conduct an inspection/job safety analysis in order to identify safety and health hazards and conditions. Upon completion of such inspection/job safety analysis, if any safety or health hazards are identified, Contractor shall take all necessary precautionary steps prior to the commencement of such Work. Contractor also should request that Cimarex identify any such hazards of which it is aware. Cimarex shall respond to Contractor's inquiries respecting hazards present at the Work Site known to Cimarex and, as requested by Contractor, provide information regarding controls and countermeasures that are available, if any. Contractor agrees to communicate these hazards to its employees and subcontractors and that all employees and subcontractors who may be exposed to these hazards have been trained to take all necessary measures to assure their safety and health. Contractor further acknowledges that any such hazards could lead to the serious injury or death of a worker or Third Party. Because of the nature of these risks, Contractor agrees that it will use special precautions in limiting or eliminating any such risks.     Contractor agrees that it may be subject to sanctions imposed by Cimarex for not undertaking those steps necessary to limit or eliminate those risks occurring during the course and scope of the Work. Such special sanctions include, but are not limited to, termination of the Agreement.

D.4     Contractor shall have in place, a comprehensive Health, Safety, and Environmental program that meets all applicable federal, state and local laws and regulations and all of its employees and those of its subcontractors will adhere to it. Subject to Section 8.1 of the Agreement, prior to commencing the Work, Contractor should review Cimarex's Environmental, Safety and Health Manual at www.cimarex.com/CimarexSafetyManual.pdf and should be reviewed by Contractor on a regular basis. Material Safety Data Sheets are available from Cimarex upon request by Contractor.

D.5     Contractor is responsible for the safety education and training of its employees and subcontractors.

a.     Contractor's employees and subcontractors may attend as observers Cimarex training and safety meetings. Cimarex will not provide training certification to Contractor's employees or subcontractors.

b.     Contractor shall document any training, including, but not limited to that which may be required by Cimarex. Documentation shall include, but is not limited to the following:

- Training topic and summary of course content;
- Date and location of training;
- Attendees' names and signatures;
- Name of instructor; and
- Criteria for successful completion of training and requirements for repeat or refresher training, if necessary.

c.     Contractor will provide employees and subcontractors that have been properly trained prior to starting the Work. Contractor agrees to provide evidence of such training to Cimarex upon request.

d.     The overall scope of the training can be organized into broad categories as listed below:

- New employee and subcontractor orientation is mandatory. This orientation shall include, but is not limited to, Contractor's safety policies, safety manuals, first aid/CPR, accident reporting procedures, safety meeting participation, personal protective equipment, and enforcement procedures.

- Contractor is responsible for training its employees and subcontractors in the Contractor's emergency procedures along with any applicable provisions of any Cimarex local emergency action/response plan if provided to Contractor, and for complying with all other applicable local, state, and federal laws/regulations.

D.6     Contractor shall be responsible for the training and routine monitoring of its employees, agents and subcontractors to ensure safe work practices are being followed.

D.7     Contractor shall promptly report to Cimarex as follows:

a.     All accidents, injuries, claims, spills, and near-misses (including first aid treatments) occurring at the Work Site shall be reported to the Cimarex representative.

b.     Contractor shall provide the Cimarex representative with an immediate, verbal report of any OSHA recordable injury or illness.

c.      By the end of the next day following an occurrence, Contractor shall provide Cimarex with a copy of the Contractor's *Employer's Report of Occupational Injury or Illness* or comparable state form for the reporting of injuries and illnesses occurring at the Work Site. Regarding spills, the Contractor will provide a copy of the spill report or summary of report.

d.      Contractor shall provide the Cimarex representative with an immediate verbal report of any hazards found or created by the Work.

D.8     Prior to commencing any Work, Contractor may request a copy of any relevant provisions of applicable Cimarex emergency action and/or response plan(s).

Contractor shall prepare its own emergency action/response plan in cooperation with Cimarex personnel. At a minimum, this plan shall include:

- Written plans, as appropriate, outlining emergency procedures and identifying response personnel in case of fire, explosion, or chemical release;

- Posting of emergency telephone numbers (fire, police, ambulance, doctor, etc.) and GPS location coordinates at or near the Work Site;

- At least one Contractor employee certified to perform emergency first aid/CPR, and who has been trained under the blood borne pathogens standard, shall be on site and/or immediately available during all working hours; and

- First aid supplies at or near the Work Site.

D.9     Contractor shall keep available for Cimarex review for at least three (3) years, or longer if required by law, records, including, but not limited to, the following:

- OSHA injury and illness log;

- An *Employer's Report of Occupational Injury or Illness*, or comparable state form, documenting every on-site injury or illness;

- Safety meeting minutes, if any, and the names of the attendees;

- Documentation of training;

- Substance abuse testing statistics; and

- Accident investigations with root causes and corrective actions.

D.10    Contractor's personnel (and its subcontractors' personnel) shall wear appropriate personal protective equipment ("PPE") in conformance with applicable law for protection, and/or Cimarex policy, whichever is the more strict, against potential workplace hazards. Contractor is responsible for having a PPE program for its employees and subcontractors. This program shall include provisions for providing PPE when required by regulations and procedures for assuring that the proper PPE is worn.

D.11    Record retention requirements set forth in this Exhibit "D" shall survive termination of the Agreement.

**EXHIBIT "E"**
Attached to and made part of the Agreement

## SUBSTANCE ABUSE

Contractor, as a condition of having access to Cimarex's premises, and subject to applicable law, agrees that:

### E.1   APPLICABILITY

a.   Contractor shall have in effect before commencing Work an appropriate and comprehensive substance abuse testing program for Contractor's employees and subcontractors. Contractor's comprehensive substance abuse testing program shall comply with all applicable laws or regulations.

b.   A comprehensive substance abuse testing program is not required of Contractor for employees and subcontractors who enter a Work Site for brief periods of time and are not engaged in safety-sensitive activities. Examples include, but are not limited to, sales personnel, delivery persons, messengers, and vending machine or office equipment service personnel.

### E.2   SPECIFICATIONS

a.   If Contractor is subject to and implements the Department of Transportation (DOT) Substance Abuse Program, such compliance shall satisfy Cimarex's requirements.

b.   If Contractor is not subject to DOT regulation, it shall be required to implement a program that is at least substantially equivalent to the DOT program including:

- Pre-employment or pre-work testing;
- Random testing;
- Substances and screening/confirmation levels at least equivalent to the DOT program;
- Testing of employees and subcontractors when there is reasonable suspicion of the use of illegal drugs; and
- Testing of employees and subcontractors when there is reasonable suspicion that substance abuse may have been a contributing factor to an injury or accident on the Cimarex's premises.

### E.3   NOTIFICATIONS

a.   Contractor's employees and subcontractors shall be subject to the following rules that prohibit:

1.   The manufacture, sale, purchase, transfer, use, or possession of:

- Illegal drugs, narcotics, or other unlawful substances;
- Alcohol or other intoxicating beverages;
- Medically authorized drugs used improperly or unsafely;
- Drug paraphernalia; and

- Firearms or weapons.

2. Reporting for Work or working at a Work Site under the influence of alcohol or having illegal drugs, narcotics, prescribed drugs that would prevent safe operation (prescription with stated limitations and warnings), and other unlawful substances present in their systems.

b. Any Contractor employee or subcontractor that violates any of the provisions of Section 3.a of this Exhibit shall be removed from the Work Site by Contractor and shall not be allowed to reenter without written permission of Cimarex's authorized representative.

c. Contractor's employees and subcontractors shall be subject to searches of their persons and personal effects when entering, while on or when leaving the Work Site. Such searches shall be conducted by Cimarex or a Third Party, at Cimarex's direction, without prior announcement, and at such times and locations as Cimarex, in its sole discretion, may determine.

d. Cimarex reserves the right to conduct unannounced drug and alcohol testing of Contractor's employees and subcontractors while they are performing or in connection with the Work and/or while on Cimarex's premises, as frequently as Cimarex, in its sole discretion, may determine and to the extent permitted by applicable law or regulation.

e. Searches and tests will be conducted only with the consent of the individual. However, refusal to consent will result in removal from the Work Site, and the individual shall not be allowed to re-enter without Cimarex's express permission granted by the Cimarex representative.

f. Contractor shall be responsible for advising and discussing with any unions representing Contractor employees or subcontractors the conditions of this Exhibit "E."

g. Contractor shall include the conditions of this Exhibit "E" in any subcontract work to be performed on Cimarex's Work Site.

h. Cimarex may terminate the Agreement immediately in the event of non-compliance with this Exhibit "E."

**EXHIBIT "F"**
Attached to and made part of the Agreement

**EQUAL EMPLOYMENT OPPORTUNITY**

During performance of Work under the Agreement, Contractor shall comply fully with applicable terms and conditions of all relevant Executive Orders and Acts, and the promulgated rules, regulations, and orders issued thereunder (presently in place, hereafter modified, or newly adopted) including, without limitation, those listed below, whose terms and conditions are in part set forth below and in part incorporated herein by reference.

**A) Executive Order Number 11246 of September 24, 1965, as amended.**

**Section 202 of Executive Order Number 11246 of September 24, 1965, as amended.**

During the performance of the Agreement, Contractor agrees as follows:

(1) Contractor shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: employment, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and, selection for training, including apprenticeship. Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) Contractor shall, in all solicitations or advancements for employees placed by or on behalf of Contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

(3) Contractor shall send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of Contractor's commitments under Section 202 of Executive Order Number 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) Contractor shall comply with all provisions of Executive Order Number 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) Contractor shall furnish all information and reports required by Executive Order Number 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by Contractor and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the Contractor's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this Agreement may be cancelled, terminated, or suspended in whole or in part, and Contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order Number

11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order Number 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7)     Contractor will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order Number 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. Contractor will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions including sanctions for noncompliance. Provided, however, that in the event Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, Contractor may request to United States to enter into such litigation to protect the interests of the United States.

### Section 203 of Executive Order Number 11246 of September 24, 1965, as amended.

(1)     Contractor shall file Compliance Reports with Cimarex or the Secretary of Labor as may be directed. Contractor shall also cause each of his subcontractors to file Compliance Reports with the contracting agency or the Secretary of Labor as may be directed. Compliance Reports shall be filed within such times and shall contain such information as to the practices, policies, programs, and employment policies, programs, and employment statistics of Contractor and each subcontractor, and shall be in such form, as the Secretary of Labor may prescribe.

(2)     Contractor, subcontractors, proposed subcontractors, or bidders may be required to state whether they have participated in any previous contract subject to the provisions of this Order, or any preceding similar Executive Order, and in that event to submit, on behalf of themselves and their proposed subcontractors, Compliance Reports prior to or as an initial part of their bid or negotiation of a contract.

(3)     If Contractor or a subcontractor has a collective bargaining agreement or other contract or understanding with a labor union or an agency referring workers or providing or supervising apprenticeship or training for such workers, the Compliance Report shall include such information as to such labor union's or agency's practices and policies affecting compliance as the Secretary of Labor may prescribe. Provided, that to the extent such information is within the exclusive possession of a labor union or an agency referring workers or providing or supervising apprenticeship or training and such labor union or agency shall refuse to furnish such information to the contracting agency, the contracting agency shall so certify to the Secretary of Labor as part of its compliance report and shall set forth what efforts he has made to obtain such information.

### B)     Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. § 4212, as amended.

Contractor shall take affirmative action to employ and advance in employment qualified special disabled veterans, veterans of the Vietnam era, and any other veterans who served on active duty during a war or in a campaign or expedition for which a campaign badge has been authorized. Contractor shall also cause each of his subcontractors to abide by these provisions. Contractor and any subcontractors shall list immediately with the appropriate local employment service office all of its employment openings, except openings for executive and top level management positions, positions which are to be filled from within the organization, and positions lasting three days or less may be excluded. Each such local office shall give such veterans priority in referral to such employment openings.

Contractor and any subcontractors shall report at least annually to the Secretary of Labor on the following: (a) the number of employees in the work force of such contractor, by job category and hiring location, who are special disabled veterans, veterans of the Vietnam era, or other veterans who served on active duty during a war or in a campaign or expedition for which a campaign badge has been authorized; (b) the total number of new employees hired by the contractor during the period covered by the report and the number of such employees who are special disabled veterans, veterans of the Vietnam era, or other veterans who served on active duty during a war or in a campaign or expedition for which a campaign badge has been authorized; and, (c) the maximum number and the minimum number of employees of such contractor during the period covered by the report.

**C)**      **Rehabilitation Act of 1973, 29 U.S.C. § 791, et seq., as amended.**

If the Work during the term of this Agreement will be in excess of $10,000, Contractor shall take affirmative action to employ and advance in employment qualified individuals with disabilities. If Contractor or subcontractors shall enter into a subcontract in excess of $10,000, such subcontractor shall also take affirmative action to employ and advance in employment qualified individuals with disabilities.

# EXHIBIT B



## HORIZONTAL DRILLING SERVICES QUOTATION

### for:



## Cimarex Energy

**August 17, 2018**



## Horizontal Drilling Services Quotation

### Cimerex Energy

**Generic Bid**

| Horizontal Drilling Package – Full Package: | | |
|---|---|---|
| | Operating Rate: | ███ |
| | Standby Rate: | ███ |

| Motor Rental Charges: | |
|---|---|
| 8.0" Intrepid – 7:8-5.9 – FBH at 1.50" Slick | ███ |
| 7.0" Intrepid – 5:6-8.4 – FBH at 1.50" Slick | ███ |
| 6.75" Intrepid – 7:8-5.0 – FBH at 1.50" Slick | ███ |
| 5.0" Intrepid – 6:7-8.0 – FBH at 1.50" Slick | ███ |
| Directional Driller – Note: 24 hour Operations will require two (2) drillers. | ███ |

If MWD is picked up, charges will revert to Package Rate above. Package Rate will be charged from the time MWD tools are picked up and will be in addition to any motor rental charges previously incurred. If MWD is released; but picked up later in the well, an additional Well Service Charge of ███ will apply to re-mobilize the MWD personnel and equipment.

| Horizontal Drilling Package includes: | |
|---|---|
| Directional Drillers (2) | MWD Specialists (2) |
| Performance Positive Displacement Motors | Mud Pulse MWD (D&I) System |
| Float Sub, UBHO & BHA Cross-Overs | NMDC (2); Slick or Flex (as required) |
| Stabilization for BHA & Directional Control | Self-Contained Kit Box with Complete Spares |
| Engineering & Planning Support, including: Well Planning, Wall Plots (4), Daily Updates & PVA's, MWD Survey Reports, Field Logs, Final Logs (3) & Regulatory Filings | |

| Additional Service Charges - General: | |
|---|---|
| Well Service Charge: | ███ |
| Job Preparation & Mobilization Charge | Personnel Per Diem |
| MWD Inspection and Repairs for Normal Wear & Tear | Personnel Transportation |
| MWD Batteries and HazMat Disposal of Depleted Batteries | All API Tubular Inspections, Re-Work & Re-Cuts (Except Motor) |
| Floats (2) Per Well & Screens (1) Per Well | End of Well (EOW) Reports |
| Abnormal Wear & Tear or Damages Resulting From Drilling Operations | ███ |
| Personnel Lodging at Wellsite: | Billed to Client |
| Transportation of Tools and Equipment: Third-Party Transportation & Delivery will be billed directly to Client by Supplier. Transportation billed through *Intrepid* will be billed at ███ | |

| Additional Personnel Charges – Optional at Client Request: | | |
|---|---|---|
| Standby Rate Upcharge to Pay Drillers Full Days on Standby Days: | ███ | Driller/Standby Day |
| Standby Rate Upcharge to Pay MWD Specialists Full Days on Standby Days: | ███ | MWD/Standby Day |

| Additional Service Charges – BHA & PDM: | | | | | | |
|---|---|---|---|---|---|---|
| Motor Sizes | 4.75" to 5.0" | 5.75" | 6.75" | 7.0" | 7.75" to 8.0" | 9.62" |
| Motor Inspection (CAT 5) & Re-Dress Charge | ███ | ███ | | | | |
| T.H. Hill – CAT 5 Inspection Oversight – Per Motor | | | | | $1000 / Motor | |
| HPE Stator Re-Line | ███ | ███ | ███ | ███ | ███ | ███ |
| Rotor Re-Chrome | ███ | ███ | ███ | ███ | ███ | ███ |
| PDM Dynamometer Testing | | | | As Incurred – ███ | | |

**‖⋮INTREPID**

| String Stabilization – other than primary BHA | | |
|---|---|---|
| Stabilization Re-Dress | | /O.D. Inch |
| Screens (Additional) | | Each |
| Floats (Additional) | | Each |
| PDM's exposed to oil base muds during drilling operations will require a mandatory stator re-line. | | |

| *Additional Service Charges - MWD:* | | |
|---|---|---|
| Gamma Service | | |
| Rotary Pulsers for High Solids/LCM | | |

An operating day is defined as the 24 hour period beginning at 12:00 AM and lasting until 12:00 AM the following day. A Daily Operating Rate is charged for each operating day or portion of the operating day when *Intrepid* personnel are at the job site and *Intrepid* equipment is in the hole; including when personnel are unable to perform their assigned tasks due to circumstances beyond their control. This includes, but is not limited to, rig or pump repairs; well control and fishing operations. A Standby Rate is charged when activities beyond *Intrepid* control prevent its personnel from performing their assigned tasks and *Intrepid* personnel must remain on location and *Intrepid* equipment is not in the hole.

*Intrepid* assumes the client will provide a drilling rig that is appropriately rated, equipped, and maintained to provide adequate lifting capacity, string over pull, fluid flow, mud conditioning, hole cleaning, and noise free and regulated electrical power, during directional drilling operations.

The client is not responsible for repair and maintenance related to the normal wear and tear of *Intrepid* equipment. The client is responsible for repair and maintenance of *Intrepid* equipment resulting from damage beyond normal wear and tear or damage beyond repair. Normal wear and tear is defined as a condition that can be remedied through regular routine maintenance. Examples of abnormal damage, beyond normal wear and tear, are: damages resulting from operating equipment outside published operating parameters; damaged tubular connections during drilling operations; erosion of downhole components due to high mud solids and sand content; damages from loss circulation material; damage to surface electronic components from errant rig electrical power surges; damages related to excessive downhole shock and vibration; damages related to downhole equipment exposure to $H^2S$, $CO^2$ or $CH^2$; damages related to downhole temperatures in excess of 150°C (Standard Equipment); abnormal eccentric wear (O.D.) due to abrasive formations; rotor or stator damage due to use in air / foam /mist, salt saturated, synthetic or oil based mud.

This quotation is subject to *Intrepid Directional Drilling Specialists,* General Terms and Conditions, attached. This quotation is submitted 8/17/18 and is valid for 30 days.



## LOST IN HOLE
## REPLACEMENT COSTS

### Lost In Hole Coverage Charges & Replacement Costs -- MWD:

| | Daily Premium | After 1st Loss | Replacement Cost with Coverage | Replacement Cost without Coverage |
|---|---|---|---|---|
| Standard D&I MWD Tool String | ▮ | ▮ | ▮ | ▮ |
| Standard D&I MWD Tool String with Gamma | ▮ | ▮ | ▮ | ▮ |

Replacement Cost shown is for Standard D&I Mud Pulse MWD System – EM-MWD, Rotary Pulser & Focused Gamma at additional cost.
Replacement Cost of MWD includes; MWD Tool String and Muleshoe Sleeve Assembly. Tubulars listed separately below.
Third Party Rental MWD, Lost-In-Hole will be invoiced at lowest negotiated price from supplier.

### Lost-In-Hole Coverage Charges and Replacement Costs -- PDM:

| PDM Motor O.D. | 4.75″ | 5.00″ | 5.75″ | 6.75″ | 7.00″ | 7.75″ | 8.00″ | 9.62″ |
|---|---|---|---|---|---|---|---|---|
| Lost-In-Hole Coverage Daily Premium | | | | | | | | |
| Replacement Cost with Coverage | | | | | | | | |
| Replacement Cost without Coverage | | | | | | | | |
| Carbide Rotor Up-Charge | | | | | | | | |



Third-Party Rental Motors, Lost-In-Hole will be invoiced at lowest negotiated price from supplier.

### Lost in Hole - Replacement Costs - Tubulars:

| Tubular Sizes | 3.5″ to 3.75″ | 4.75″ to 5.0″ | 6.25″ to 6.50″ | 6.75″ to 7.25″ | 8.00″ to 9.25″ |
|---|---|---|---|---|---|
| Slick NMDC | | | | | |
| FLEX NMDC | | | | | |
| FLEX NMDC Pony | | | | | |
| UBHO | | | | | |
| Float Sub | | | | | |
| Nortrac Stabilizer | | | | | |
| X-Over / Lift Sub | | | | | |
| Special X-Over | | | | | |
| XT/HT Connection Up-Charge | | | | | |

Lost-In-Hole Coverage is not available for tubulars.
Third Party Rental tubulars and stabilization will be invoiced at lowest negotiated price from supplier.

Lost in Hole Coverage – General Terms:
- Lost in Hole Coverage reduces the replacement cost of downhole components lost during drilling operations.
- Lost in Hole Coverage reduces the first loss cost to the amount indicated above as Replacement Cost With Coverage. A second loss will be at ▮ Lost in Hole Coverage is not available after two losses during the same well/job.
- Lost in Hole Coverage for PDM and MWD Systems must be purchased in advance.
- Lost in Hole Coverage Premium is charged for each day or partial day tools are below the rotary table.
- Costs of all wireline services used in the retrieval of MWD are at client's expense.

# EXHIBIT C

Intrepid Directional Drilling Specialists, Ltd.
10314 Hwy 191
Midland, Texas 79707



# INVOICE

Invoice Number:
01211902
Invoice Date:
Jan 21, 2019
Page:1

Voice: 432-699-4304
Fax:  432-699-4404

**Sold To:**

Cimarex Energy Co
Attn: Accounts Payable
202 S Cheyenne Ave Suite 1000
Tulsa, OK  74103

| Customer ID | Job Name | Payment Terms | |
|---|---|---|---|
| Cimarex | Riverboat 12-1 1H | Net 30 Days | |
| **Rig Name** | **Job Location** | **Ship Date** | **Due Date** |
| h&p 393 | Eddy Co, NM | 1/3/19 | 2/20/19 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| 1.00 | | Service Charge | | |
| 2.00 | | Standby | | |
| 4.00 | | Personnel | | |
| 12.00 | | Directional Services | | |
| 1.00 | | PDM Redress - 80007 | | |
| 2.00 | | PDM Redress - 70046, 70024 | | |
| 16.17 | | Motor Hours - 80007 | | |
| 56.00 | | Motor Hours - 70046 | | |
| 1.00 | | Stabilizer - BT6751379 | | |
| 6.00 | | Stabilization Redress - BT6751379 | | |
| 1.00 | | Passthrough Trucking - 24495 | | |
| 1.00 | | Passthrough Trucking - 1907 | | |
| 1.00 | | PDM LIH - 70018 | | |
| 1.00 | | NM Sales Tax 5.9583% | | |
| | | ID2093 | | |

| | | |
|---|---|---|
| Subtotal | | 322,238.26 |
| Sales Tax | | |
| Total Invoice Amount | | 322,238.26 |
| Payment/Credit Applied | | |
| **TOTAL** | | **322,238.26** |

Check/Credit Memo No:



**Intrepid Directional Drilling Specialists**
10314 State Highway 191
Midland, TX 79707
432-699-4304

Date:
Customer ID:    Cimarex
Invoice Number:

Bill To:



| Job Name | | Ship Date | | Rig Name | | |
|---|---|---|---|---|---|---|
| Riverboat 12-1 WOPA Fed Com 1H | | 1/3/2019 | | H&P 393 | | |

| Date | Directional Services | Redress | Refine | Stabilizers | Misc | Daily Total |
|---|---|---|---|---|---|---|
| 1/3/2019 | | | | | | |
| 1/4/2019 | | | | | | |
| 1/5/2019 | | | | | | |
| 1/6/2019 | | | | | | |
| 1/7/2019 | | | | | | |
| 1/8/2019 | | | | | | |
| 1/9/2019 | | | | | | |
| 1/10/2019 | | | | | | |
| 1/11/2019 | | | | | | |
| 1/12/2019 | | | | | | |
| 1/13/2019 | | | | | | |
| 1/14/2019 | | | | | | |
| 1/15/2019 | | | | | | |
| 1/16/2019 | | | | | | |
| 1/17/2019 | | | | | | |
| 1/18/2019 | | | | | | |
| 1/19/2019 | | | | | | |
| 1/20/2019 | | | | | | |
| Totals | 133,050.00 | 11,100.00 | 0.00 | | 176,103.26 | 322,238.26 |

Please contact Customer Service at 432-699-4304 with any questions or concerns

Thank you for your business!

10314 State Highway 191, Midland, TX 79707

Intrepid DDS
10314 State Hgihway 191
Midland, TX 79707



**Credit Memo**

Credit Memo Number
01211902CR

Credit Date
Feb 28, 2019

Page:
1

Voice:
Fax:

Credit To:
  Cimarex Energy Co
  Attn: Accounts Payable
  202 S Cheyenne Ave Suite 1000
  Tulsa, OK 74103

| Well Name | County | Rig |
|---|---|---|
| Riverboat 12-1 1H | | h&p 393 |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| -2.00 | | Standby | ██ | ██ |
| -1.00 | | NM Sales Tax 5.9583% | | |
| | | ID2093 | | |

| | | |
|---|---|---|
| Subtotal | -4,788.53 |
| Sales Tax | |
| Freight | |
| **TOTAL** | -4,788.53 |

Invoice No:

Intrepid Directional Drilling Specialists, Ltd.
10314 Hwy 191
Midland, Texas 79707



Voice: 432-699-4304
Fax: 432-699-4404

# INVOICE

Invoice Number:
12271805
Invoice Date:
Dec 27, 2018
Page:1

**Sold To:**

Cimarex Energy Co
Attn: Accounts Payable
202 S Cheyenne Ave Suite 1000
Tulsa, OK 74103

| Customer ID | Job Name | Payment Terms | |
|---|---|---|---|
| Cimarex | Vaca Draw 20-17 3H | Net 30 Days | |
| **Rig Name** | **Job Location** | **Ship Date** | **Due Date** |
| Cactus 163 | Lea Co, NM | 12/5/18 | 1/26/19 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| 1.00 | | Service Charge | | |
| 3.00 | | Standby | | |
| 11.00 | | Personnel | | |
| 8.00 | | Directional Services | | |
| 4.00 | | PDM Redress - 80014, 80006, 80018, 80019 | | |
| 1.00 | | PDM Redress - 70023 | | |
| 1.00 | | PDM Redress - 67146 | | |
| 79.08 | | Motor Hours - 80014 | | |
| 43.50 | | Motor Hours - 80006 | | |
| 39.42 | | Motor Hours - 80018 | | |
| 5.00 | | Float Charge | | |
| 1.00 | | Passthrough Trucking - 7380789 | | |
| 1.00 | | NM Sales Tax 5.5% | | |
| | | ID2043 | | |

| | | |
|---|---|---|
| Subtotal | | 214,380.22 |
| Sales Tax | | |
| Total Invoice Amount | | 214,380.22 |
| Payment/Credit Applied | | |
| **TOTAL** | | **214,380.22** |

Check/Credit Memo No:



**INTREPID**

Intrepid Directional Drilling Specialists, Ltd.
10314 State Highway 191
Midland, TX 79707
432-699-4304

Date:
Customer ID:   Cimarex
Invoice Number:

Bill To:

| Job Name | Ship Date | Rig Name |
|---|---|---|
| Vaco Draw 20-17 Fed 3H | 12/5/2018 | Cactus 163 |

| Date | Directional Services | Gamma | Redress | Reline/Rephone | Motor Hours | Misc | Daily Total |
|---|---|---|---|---|---|---|---|
| 12/5/2018 | | | | | | | |
| 12/6/2018 | | | | | | | |
| 12/7/2018 | | | | | | | |
| 12/8/2018 | | | | | | | |
| 12/9/2018 | | | ██ | | ██ | ██ | |
| 12/10/2018 | | | | | | | |
| 12/11/2018 | | | | | | | |
| 12/12/2018 | | | | | | | |
| 12/13/2018 | | | ██ | | ██ | ██ | |
| 12/14/2018 | | | | | | | |
| 12/15/2018 | | | | | | | |
| 12/16/2018 | | | ██ | | ██ | | |
| 12/17/2018 | | | | | | | |
| 12/18/2018 | | | ██ | | | | |
| 12/19/2018 | | | | | | | |
| 12/20/2018 | | | ██ | | | ██ | |
| 12/21/2018 | | | | | | | |
| 12/22/2018 | | | | | | | |
| 12/23/2018 | | | | | | | |
| 12/24/2018 | | | | | | | |
| 12/25/2018 | | | | | | | |
| 12/26/2018 | | | | | | ██ | |
| 12/27/2018 | | | | | | | 0.00 |
| 12/28/2018 | | | | | | | 0.00 |
| Total: | 127,575.00 | 0.00 | 18,600.00 | 0.00 | 48,500.00 | 12,079.00 | 214,380.22 |

Please contact the customer service at 432-699-4304 if you have questions about this invoice

Thank you for your business!

Intrepid State Highway 191, Midland, TX 79707

Intrepid DDS
10314 State Hgihway 191
Midland, TX  79707



# Credit Memo

Credit Memo Number:
12271805CR

Credit Date:
Feb 28, 2019

Page:
1

Voice:
Fax:

Credit To:
Cimarex Energy Co
Attn: Accounts Payable
202 S Cheyenne Ave Suite 1000
Tulsa, OK  74103

| Well Name | County | Rig |
|---|---|---|
| Vaca Draw 20-17 3H | | Cactus 163 |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| -1.00 | | Standby | ███ | ███ |
| -1.00 | | NM Sales Tax 5.5% | | |
| | | ID2043 | | |

|  |  |
|---|---|
| Subtotal | -2,452.88 |
| Sales Tax | |
| Freight | |
| **TOTAL** | -2,452.88 |

Invoice No:

Intrepid Directional Drilling Specialists, Ltd.
10314 Hwy 191
Midland, Texas 79707



## INVOICE

Invoice Number:
12311823
Invoice Date:
Dec 31, 2018
Page:1

Voice: 432-699-4304
Fax:  432-699-4404

**Sold To:**

Cimarex Energy Co
Attn: Accounts Payable
202 S Cheyenne Ave Suite 1000
Tulsa, OK 74103

| Customer ID | Job Name | Payment Terms | |
|---|---|---|---|
| Cimarex | Vaca Draw 20-17 4H | Net 30 Days | |
| **Rig Name** | **Job Location** | **Ship Date** | **Due Date** |
| Cactus 163 | Lea Co, NM | 12/27/18 | 1/30/19 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| 1.00 | | Service Charge | ▮ | ▮ |
| 2.00 | | Standby | | |
| 3.00 | | Personnel | | |
| 1.00 | | PDM Redress - 9620020 | | |
| 1.00 | | PDM Redress - 80003 | | |
| 12.00 | | Motor Hours - 9620020 | | |
| 27.42 | | Motor Hours - 80003 | | |
| 2.00 | | Float Charge | | |
| 1.00 | | NM Sales Tax 5.5% | | |
| | | ID2044 | | |

| | | |
|---|---|---|
| Subtotal | | 53,831.38 |
| Sales Tax | | |
| Total Invoice Amount | | 53,831.38 |
| Payment/Credit Applied | | |
| **TOTAL** | | **53,831.38** |

Check/Credit Memo No:

# ⦀⦀INTREPID

Intrepid Directional Drilling Specialists, Ltd.
10314 State Highway 191
Midland, TX 79707
432-699-4304

Date:
Customer ID.  Cimarex
Invoice Number:

Bill To:



| Job Name | Ship Date | Rig Name |
|---|---|---|
| Vaca Draw 20-17 Fed 4H | 12/27/2018 | Cactus 163 |

| Date | Directional Services | Gamma | Redress | Reline/Rechrome | Motor Hours | Misc | Daily Total |
|---|---|---|---|---|---|---|---|
| 12/27/2018 | | | | | | | |
| 12/28/2018 | | | | | | | |
| 12/29/2018 | | | | | | | |
| 12/30/2018 | | | | | | | |
| 12/31/2018 | | | | | | | |
| 1/1/2019 | | | | | | | 0.00 |
| 1/2/2019 | | | | | | | 0.00 |
| 1/3/2019 | | | | | | | 0.00 |
| Total: | 22,150.00 | 0.00 | 7,920.00 | 0.00 | 9,855.00 | 13,906.38 | 53,831.38 |

Please contact us at your soonest if there is a reason you get questions on charges.
Thank you for your business!

utll process the rigup and McBeal invoice.

Intrepid DDS
10314 State Hgihway 191
Midland, TX  79707



# Credit Memo

Credit Memo Number:
12311823CR

Credit Date:
Feb 28, 2019

Page:
1

Voice:
Fax:

Credit To:
Cimarex Energy Co
Attn: Accounts Payable
202 S Cheyenne Ave Suite 1000
Tulsa, OK  74103

| Well Name | County | Rig |
|---|---|---|
| Vaca Draw 20-17 4H | | Cactus 163 |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| -2.00 | | Standby | ███ | ███ |
| -1.00 | | NM Sales Tax 5.5% | | |
| | | ID2044 | | |

| | | |
|---|---|---|
| Subtotal | | -4,905.75 |
| Sales Tax | | |
| Freight | | |
| **TOTAL** | | -4,905.75 |

Invoice No:

Intrepid Directional Drilling Specialists, Ltd.
10314 Hwy 191
Midland, Texas 79707



# INVOICE

Invoice Number:
01131902
Invoice Date:
Jan 13, 2019
Page:1

Voice: 432-699-4304
Fax:  432-699-4404

**Sold To:**

Cimarex Energy Co
Attn: Accounts Payable
202 S Cheyenne Ave Suite 1000
Tulsa, OK  74103

| Customer ID | Job Name | Payment Terms | |
|---|---|---|---|
| Cimarex | Vaca Draw 20-17 4H | Net 30 Days | |
| **Rig Name** | **Job Location** | **Ship Date** | **Due Date** |
| Cactus 163 | Lea Co, NM | 1/1/19 | 2/12/19 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| 8.00 | | Personnel | | |
| 4.00 | | Directional Services | | |
| 1.00 | | PDM Redress - DR77028 | | |
| 1.00 | | PDM Redress - DR67510 | | |
| 1.00 | | PDM Redress  70038 | | |
| 2.00 | | Float Charge | | |
| 62.50 | | Motor Hours - DR77028 | | |
| 1.00 | | Passthrough Trucking - 18153 | | |
| 1.00 | | Passthrough Trucking - 18092 | | |
| 1.00 | | NM Sales Tax 5.5% | | |
| | | ID2044-1 | | |

| | | |
|---|---|---|
| Subtotal | | 95,224.30 |
| Sales Tax | | |
| Total Invoice Amount | | 95,224.30 |
| Payment/Credit Applied | | |
| **TOTAL** | | **95,224.30** |

Check/Credit Memo No:



Intrepid Directional Drilling Specialists
10314 State Highway 191
Midland, TX 79707
432-699-4304

Date:
Customer ID:     Cimarex
Invoice Number:

Bill To:



| Job Name | Ship Date | Rig Name |
|---|---|---|
| Vaca Draw 20-17 Fed 4H | 1/1/2019 | Cactus 163 |

| Date | Directional Services | Redress | Rehne | Motor Hours | Misc | Daily Total |
|---|---|---|---|---|---|---|
| 1/1/2019 | | | | | | |
| 1/2/2019 | | | | | | |
| 1/3/2019 | | | | | | |
| 1/4/2019 | | | | | | |
| 1/5/2019 | | | | | | |
| 1/6/2019 | | | | | | |
| 1/7/2019 | | | | | | |
| 1/8/2019 | | | | | | |
| 1/9/2019 | | | | | | |
| 1/10/2019 | | | | | | |
| 1/11/2019 | | | | | | |
| 1/12/2019 | | | | | | |
| Totals | 83,890.00 | 3,900.00 | 0.00 | 990.00 | | 95,224.30 |

Please remit all payment to our office at 10314 TX state highway 191 in Midland, TX 79707.
Thank you for your business!

10314 East Highway 191 Midland TX 79707

Intrepid Directional Drilling Specialists, Ltd.
10314 Hwy 191
Midland, Texas 79707



**INVOICE**

Invoice Number:
12281802
Invoice Date:
Dec 28, 2018
Page:1

Voice: 432-699-4304
Fax:  432-699-4404

**Sold To:**

Cimarex Energy Co
Attn: Accounts Payable
202 S Cheyenne Ave Suite 1000
Tulsa, OK  74103

| Customer ID | Job Name | Payment Terms | |
|---|---|---|---|
| Cimarex | James 19 Fed 34 | Net 30 Days | |
| **Rig Name** | **Job Location** | **Ship Date** | **Due Date** |
| Cactus 148 | Lea Co, NM | 11/7/18 | 1/27/19 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| 1.00 | | Passthrough Stabilizer Rental and Damages- 31871 | ▇ | ▇ |
| 1.00 | | NM Sales Tax 5.5% | | |
| | | ID2016 | | |

| | | |
|---|---|---|
| Subtotal | | 4,347.95 |
| Sales Tax | | |
| Total Invoice Amount | | 4,347.95 |
| Payment/Credit Applied | | |
| **TOTAL** | | **4,347.95** |

Check/Credit Memo No:

# EXHIBIT D

**Intrepid DDS**
10314 State Hgihway 191
Midland, TX 79707

# INVOICE

| | |
|---|---|
| Invoice Number: | 03041905 |
| Invoice Date: | Mar 4, 2019 |
| Page: | 1 |

*Duplicate*

Voice:
Fax:

| Bill To: | Ship to: |
|---|---|
| Cimarex Energy Co<br>Attn: Accounts Payable<br>202 S Cheyenne Ave Suite 1000<br>Tulsa, OK 74103 | Cimarex<br>Attn: Accounts Payable<br>202 S Cheyenne Ave Suite 1000<br>Tulsa, OK 74103 |

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| Cimarex | Vaca Draw 20-17 3H | Net 30 Days | |
| **Sales Rep ID** | **Shipping Method** | **Ship Date** | **Due Date** |
| Cactus 163 | Lea Co NM | | 4/3/19 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| 1.00 | | Abnormal Wear & Tear - XSH80014 | | |
| 1.00 | | Abnormal Wear & Tear- XSH80019 | | |
| 1.00 | | Abnormal Wear & Tear- XSS70023 | | |
| 1.00 | | Abnormal Wear & Tear - XSS67145 | | |
| 1.00 | | NM Sales Tax 5.5% | | |
| | | Job Id 2043 | | |

| | | |
|---|---|---|
| Subtotal | | 21,120.23 |
| Sales Tax | | |
| Total Invoice Amount | | 21,120.23 |
| Payment/Credit Applied | | |
| **TOTAL** | | **21,120.23** |

Check/Credit Memo No:

**Intrepid DDS**
10314 State Hgihway 191
Midland, TX 79707

# INVOICE

| | |
|---|---|
| Invoice Number: | 03041906 |
| Invoice Date: | Mar 4, 2019 |
| Page: | 1 |

*Duplicate*

Voice:
Fax:

| Bill To: | Ship to: |
|---|---|
| Cimarex Energy Co<br>Attn: Accounts Payable<br>202 S Cheyenne Ave Suite 1000<br>Tulsa, OK 74103 | Cimarex<br>Attn: Accounts Payable<br>202 S Cheyenne Ave Suite 1000<br>Tulsa, OK 74103 |

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| Cimarex | Vaca Draw 20-17 4H | Net 30 Days | |
| **Sales Rep ID** | **Shipping Method** | **Ship Date** | **Due Date** |
| Cactus 163 | Lea Co NM | | 4/3/19 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| 1.00 | | Abnormal Wear & Tear- XSS70038 | ███ | ███ |
| 1.00 | | NM Sales Tax 5.5% | | |
| | | Job ID 2044 | | |

| | | |
|---|---|---|
| Subtotal | | 3,284.66 |
| Sales Tax | | |
| Total Invoice Amount | | 3,284.66 |
| Payment/Credit Applied | | |
| **TOTAL** | | **3,284.66** |

Check/Credit Memo No:

**Intrepid DDS**
10314 State Hgihway 191
Midland, TX  79707

# INVOICE

| | |
|---|---|
| Invoice Number: | 03041907 |
| Invoice Date: | Mar 4, 2019 |
| Page: | 1 |

Voice:
Fax:

*Duplicate*

| Bill To: | Ship to: |
|---|---|
| Cimarex Energy Co<br>Attn: Accounts Payable<br>202 S Cheyenne Ave Suite 1000<br>Tulsa, OK  74103 | Cimarex<br>Attn: Accounts Payable<br>202 S Cheyenne Ave Suite 1000<br>Tulsa, OK  74103 |

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| Cimarex | Vaca Draw 20-17 8H | Net 30 Days | |
| **Sales Rep ID** | **Shipping Method** | **Ship Date** | **Due Date** |
| Cactus 148 | Lea Co NM' | | 4/3/19 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| 1.00 | | Abnormal Wear and Tear- XSH80011 | | |
| 1.00 | | Abnormal Wear and Tear- XSH0012 | | |
| 1.00 | | Abnormal Wear and Tear- XSH80017 | | |
| 1.00 | | Abnormal Wear and Tear- XSS70040 | | |
| 1.00 | | NM Sales Tax 5.5% | | |
| | | Job Id 2064 | | |

| | | |
|---|---|---|
| Subtotal | | 37,135.08 |
| Sales Tax | | |
| Total Invoice Amount | | 37,135.08 |
| Payment/Credit Applied | | |
| **TOTAL** | | **37,135.08** |

Check/Credit Memo No:

**Intrepid DDS**
10314 State Hgihway 191
Midland, TX  79707

# INVOICE

| | |
|---|---|
| Invoice Number: | 03041908 |
| Invoice Date: | Mar 4, 2019 |
| Page: | 1 |

Voice:
Fax:

*Duplicate*

| Bill To: | Ship to: |
|---|---|
| Cimarex Energy Co<br>Attn: Accounts Payable<br>202 S Cheyenne Ave Suite 1000<br>Tulsa, OK  74103 | Cimarex<br>Attn: Accounts Payable<br>202 S Cheyenne Ave Suite 1000<br>Tulsa, OK  74103 |

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| Cimarex | Vaca Draw 20-17 13H | Net 30 Days | |
| **Sales Rep ID** | **Shipping Method** | **Ship Date** | **Due Date** |
| Cactus 148 | Lea Co NM | | 4/3/19 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| 1.00 | | Abnormal Wear & Tear- XSH80007 | | |
| 1.00 | | Abnormal Wear & Tear- XSS70016 | | |
| 1.00 | | Abnormal Wear & Tear- XSS70038 | | |
| 1.00 | | NM Sales Tax 5.5% | | |
| | | Job ID 2065 | | |

| | | |
|---|---|---|
| Subtotal | | 13,704.82 |
| Sales Tax | | |
| Total Invoice Amount | | 13,704.82 |
| Payment/Credit Applied | | |
| **TOTAL** | | **13,704.82** |

Check/Credit Memo No:

**Intrepid DDS**
10314 State Hgihway 191
Midland, TX  79707

# INVOICE

| | |
|---|---|
| Invoice Number: | 03041909 |
| Invoice Date: | Mar 4, 2019 |
| Page: | 1 |

*Duplicate*

Voice:
Fax:

| Bill To: | Ship to: |
|---|---|
| Cimarex Energy Co<br>Attn: Accounts Payable<br>202 S Cheyenne Ave Suite 1000<br>Tulsa, OK  74103 | Cimarex<br>Attn: Accounts Payable<br>202 S Cheyenne Ave Suite 1000<br>Tulsa, OK  74103 |

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| Cimarex | Mescalero Ridge 21 1 | Net 30 Days | |
| **Sales Rep ID** | **Shipping Method** | **Ship Date** | **Due Date** |
| h&p 393 | Eddy Co NM | | 4/3/19 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| 1.00 | | Abnormal Wear & Tear-XSH96018 | | |
| 1.00 | | Abnormal Wear & Tear-XSH80020 | | |
| 1.00 | | Abnormal Wear & Tear-XSH80040 | | |
| 1.00 | | Abnormal Wear & Tear-XSS70024 | | |
| 1.00 | | Sales Tax 5.9583% | | |
| | | Job ID 2072 | | |

| | | |
|---|---|---|
| Subtotal | | 33,895.17 |
| Sales Tax | | |
| Total Invoice Amount | | 33,895.17 |
| Payment/Credit Applied | | |
| **TOTAL** | | **33,895.17** |

Check/Credit Memo No:

**Intrepid DDS**
10314 State Hgihway 191
Midland, TX 79707

# INVOICE

| | |
|---|---|
| Invoice Number: | 03041910 |
| Invoice Date: | Mar 4, 2019 |
| Page: | 1 |

*Duplicate*

Voice:
Fax:

| Bill To: | Ship to: |
|---|---|
| Cimarex Energy Co<br>Attn: Accounts Payable<br>202 S Cheyenne Ave Suite 1000<br>Tulsa, OK 74103 | Cimarex<br>Attn: Accounts Payable<br>202 S Cheyenne Ave Suite 1000<br>Tulsa, OK 74103 |

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| Cimarex | Rivverboat 12-1 1H | Net 30 Days | |
| **Sales Rep ID** | **Shipping Method** | **Ship Date** | **Due Date** |
| h&p 393 | Eddy Co NM | | 4/3/19 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| 1.00 | | Abnormal Wear & Tear-XSH80007 | ■ | ■ |
| 1.00 | | Abnormal Wear & Tear-XSS70046 | | |
| 1.00 | | Abnormal Wear & Tear- XSS70024 | | |
| 1.00 | | NM Tax 5.9583% | | |
| | | Job ID 2093 | | |

| | | |
|---|---|---|
| Subtotal | | 19,294.56 |
| Sales Tax | | |
| Total Invoice Amount | | 19,294.56 |
| Payment/Credit Applied | | |
| **TOTAL** | | **19,294.56** |

Check/Credit Memo No:

**Intrepid DDS**
10314 State Hgihway 191
Midland, TX 79707

# INVOICE

Invoice Number: 03041911
Invoice Date: Mar 4, 2019
Page: 1

*Duplicate*

Voice:
Fax:

| Bill To: | Ship to: |
|---|---|
| Cimarex Energy Co<br>Attn: Accounts Payable<br>202 S Cheyenne Ave Suite 1000<br>Tulsa, OK 74103 | Cimarex<br>Attn: Accounts Payable<br>202 S Cheyenne Ave Suite 1000<br>Tulsa, OK 74103 |

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| Cimarex | Cabrera 34 Fed 1H | Net 30 Days | |
| **Sales Rep ID** | **Shipping Method** | **Ship Date** | **Due Date** |
| h&p 393 | Eddy Co NM | | 4/3/19 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| 1.00 | | Abnormal Wear & Tear-XSS70021 | | |
| 1.00 | | Abnormal Wear & Tear-XSS70030 | | |
| 1.00 | | Abnormal Wear & Tear-XSS70039 | | |
| 1.00 | | NM Sales Tax 5.9583% | | |
| | | Job ID 2112 | | |

Check/Credit Memo No:

| | |
|---|---|
| Subtotal | 29,414.17 |
| Sales Tax | |
| Total Invoice Amount | 29,414.17 |
| Payment/Credit Applied | |
| **TOTAL** | **29,414.17** |

**Intrepid DDS**
10314 State Hgihway 191
Midland, TX  79707

# INVOICE

| | |
|---|---|
| Invoice Number: | 03041912 |
| Invoice Date: | Mar 4, 2019 |
| Page: | 1 |

*Duplicate*

Voice:
Fax:

| Bill To: | Ship to: |
|---|---|
| Cimarex Energy Co<br>Attn: Accounts Payable<br>202 S Cheyenne Ave Suite 1000<br>Tulsa, OK  74103 | Cimarex<br>Attn: Accounts Payable<br>202 S Cheyenne Ave Suite 1000<br>Tulsa, OK  74103 |

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| Cimarex | Cabrera 34 Fed 4H | Net 30 Days | |
| **Sales Rep ID** | **Shipping Method** | **Ship Date** | **Due Date** |
| h&p 393 | Eddy Co NM | | 4/3/19 |

| Quantity | Item | Description | Unit Price | Amount |
|---|---|---|---|---|
| 1.00 | | Abnormal Wear & Tear-XSS70047 | ■ | ■ |
| 1.00 | | Abnormal Wear & Tear-XSS70045 | | |
| 1.00 | | NM Sales Tax 5.9583% | | |
| | | Job ID 2113 | | |

| | | |
|---|---|---|
| Subtotal | | 8,537.90 |
| Sales Tax | | |
| Total Invoice Amount | | 8,537.90 |
| Payment/Credit Applied | | |
| **TOTAL** | | **8,537.90** |

Check/Credit Memo No:

# EXHIBIT E

## <u>AFFIDAVIT OF CLINT LEAZER</u>

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF MIDLAND** | § |

Before me, the undersigned Notary Public, on this day, personally appeared Clint Leazer, a person whose identity is known to me.  After I administered the oath to him, upon his oath he said:

1.  "My name is Clint Leazer.  I am over 21 years of age and am fully competent and able to testify herein.  I have never been arrested or convicted of a felony or a crime of moral turpitude. The facts and statements contained herein are true and correct and within my personal knowledge.

2.  I am the President of Intrepid Directional Drilling Specialists, Ltd. ("Intrepid") and a duly authorized agent for Intrepid.  I have personal knowledge of the facts stated in this Affidavit because of my involvement with Intrepid's projects with Cimarex Energy Company ("Cimarex").

3.  This suit on sworn account claim referred to in Intrepid's Original Complaint is related to the invoices attached to the Complaint as Exhibits C and D.

4.  Cimarex's account is due and owing to Intrepid and Intrepid has allowed all lawful offsets, payments, and credits.

5.  After all offsets, payments and credits, Cimarex is currently past due on $677,874.95 in invoices previously tendered to Cimarex by Intrepid.

6.  Additional invoices in the amount of $166,386.59 were sent to Cimarex on March 4, 2019.  These invoices are due and owing no later than 60 days after receipt.  These invoices will be due and owing to Intrepid on May 3, 2019.

7.  Intrepid believes that Cimarex has no intention of paying the invoices sent on March 4, 2019.

8.  This facts in this affidavit are true, this claim is just and true, and it is within my personal knowledge."

FURTHER AFFIANT SAYETH NOT.



Clint Leazer

SUBSCRIBED AND SWORN TO BEFORE ME, by Clint Leazer, on this ___12___ day of April, 2019.



AMBER MCCULLOUGH
Notary Public, State of Texas
My Commission Expires
September 16, 2019

NOTARY PUBLIC, State of Texas